[No. A026447. First Dist., Div. Four. Apr. 30, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ELLIS HUBER, Defendant and Appellant.

602

**COUNSEL**

Andrew H. Parnes, Thomas J. Nolan and Nolan & Parnes for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Linda Ludlow and Cynthia Choy Ong, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, J.**—John Ellis Huber appeals from a judgment of conviction entered upon jury verdicts finding him guilty of 26 felony counts the majority of which were sexual offenses, and numerous enhancements.[1] He was sentenced to state prison for the aggregate term of 106 years and 4 months. We affirm in all respects.

### I.

#### The Evidence

Because the 26 felony crimes occurred on 4 separate dates over a 22-month period and involved 6 female victims, the evidence is best grouped by date.

#### A.

#### The Prosecution's Case

*March 29, 1981 (counts 1-13)*

In March of 1981, Kathryn B. and Victoria D. lived together in a downstairs apartment at the Cardiff Garden Apartments in Campbell. On March 29, Victoria went to sleep about 10 p.m.; Kathryn arrived home from work the next morning about 1 a.m. Kathryn was later awakened by the sound of creaking floorboards. When she asked if it was Vickie, a man's voice answered "'Yes.'" Realizing it was not Victoria, Kathryn screamed for her roommate. The man "jumped" on the bed, placed his hands on Kathryn's throat, and said, "'Shut up or I'll kill you.'" Hearing Victoria stirring in the other room, the man directed Kathryn to reassure her; she did. Victoria

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Grouped by crime, defendant was convicted of four counts of first degree burglary (§ 459, counts 1, 14, 17, 26), five counts of robbery (§ 211, counts 2, 3, 15, 18, 19), three counts of forcible rape (§ 261 subd. (2), counts 4, 5, 20), ten counts of forcible oral copulation (§ 288a, subd. (c), counts 6-11, 16, 21-23), and four counts of penetration by a foreign object (§ 289, counts 12, 13, 15, 24). Counts 1 through 16 were accompanied by findings that defendant had personally used a firearm during the commission of the crimes. (§ 12022.5, counts 1-3, 14-15; § 12022.3, subd. (a), counts 4-13, 16.)

heard Kathryn say, "'It's okay. It's all right. Just come here.'" Victoria paused at the doorway to Kathryn's bedroom and saw a man wearing a cowboy hat.

Victoria asked the man who he was and what he wanted. He explained "'I am here. I only want to hide. Didn't you hear the gunshots? I am not going to hurt you. I only want to hide.'" He told Victoria to sit down, then walked into the hallway to look for something. Carrying a gun, he walked back into the bedroom and reiterated that he was not going to hurt them. "'I am just here to hide. There was some people chasing me and I just need to hide.'" He then ordered Victoria to lie on the bed and checked each woman for guns. He then ordered Victoria to remove her shift and "checked" her again for weapons. He again asked the women if they had any guns in the house and also asked if they had any drugs. To each question they answered no.

He then told the women that he had recently been released from San Quentin and it would not bother him to kill again. He also stated that he had "changed his mind" about hurting the women.

He blindfolded the women with long dresses from the closet and then stated, "'I want you girls to get each other off. I want you to go down on each other. I know you are lesbians and have done it before.'" First he forced Kathryn to perform the act upon Victoria, ordering her to "move" her head more, and saying he wanted to see "more action." At the same time, he ran his hands and the gun over Victoria's body. He then ordered Kathryn to stop and directed Victoria to perform the acts upon Kathryn. He also directed the women to masturbate and kiss each other. During these times, he called the women "honey" or "blondie" or "sweetheart." In order to appease him, they feigned having an orgasm.

He lay down on the bed and ordered Victoria to orally copulate him. He then ordered Kathryn to orally copulate him and he simultaneously masturbated her. He also inserted his gun into the vagina of each woman.

Finally, he ordered the women to lie on their stomachs. Using the telephone cord, he bound their hands and feet behind their back and then tied the women together. He then asked for their purses, retrieved them, and they could overhear him rifling through them. He mentioned that he would have to take the women's driver's licenses in case anything "happened" to him.

He gagged them and claimed to be sorry for what he had done. He then stated he would look around to see if it were clear for him to leave and threatened to shoot them if they moved. He returned in a minute saying,

" 'You didn't move. Good girls.' " They heard footsteps then the sound of a car being driven away. They waited a few minutes, then loosened the gags and the cords and drove to the police station.

Later, Kathryn discovered that $35-50 in cash and her driver's license were missing from her purse; missing from Victoria's purse were $74 in cash and a blank check.

The police determined that the man had entered the apartment through the front window by prying it open with a sharp object. Defendant's palm-print was found on the telephone in the bedroom.

Neither woman was able to identify the perpetrator. Each stated that he spoke with "sort of a drawl" like "cowboy talk." At one point in the evening, Victoria overheard the man use the name, " 'Johnny.' "

*March 26, 1982 (counts 14-16)*

In early 1982, Shawn B. lived in a ground floor apartment at 215 Union Street in Campbell. Upon completing her work as a bartender at the Black Kettle Restaurant, located near the Lariat Club in The Factory in Campbell, she returned home about 11:30 p.m. on Thursday, March 25, 1982. She fell asleep about 3 a.m. Sometime thereafter, Shawn heard a crash in the apartment; she checked the kitchen and living room but found nothing. She went back to bed. Semiconscious, she then heard her bedroom door "slam[ ] open" and a man's voice say, " 'Turn over, don't look at me. I have got a gun. You look at me, I will blow your brains out.' " The intruder wore a baseball cap.

Shawn rolled over on her stomach and the man jumped on top of her; the pillow was placed over her head. She felt what appeared to be the butt of a gun pressed to the back of her head. With some of her scarves, he blindfolded and gagged her. The man then turned on the bedroom light and allowed her to sit up.

The man walked around the bedroom "ranting and raving." He repeatedly told Shawn that he had broken into her apartment to seek refuge from some people that had "ripped him off" and shot at him during a large "cocaine deal" across the street. He removed the gag, but warned her not to scream. He then began to smoke a cigarette, allowed her to smoke also and sat down on the bed. She could smell bourbon on his breath. He engaged her in idle conversation, all the while reassuring her that he would leave as soon as he felt it was safe. Jumping from subject to subject, he asked if she had a boyfriend, or if she were a lesbian or if she had any "fantasies" about being

molested. He told her that he had been in prison and that he "hated" women because "they abused him and belittled him because of his stature."[2]

After he finished the cigarette, he ordered her off the bed so he could check to see if she had a "piece." After checking the bed, he ordered her to remove her bathrobe. When she refused, he told her to do what he told her to do. She thus removed her clothing and lay down on the bed. She heard him undo his zipper then he tried to separate her legs; when she resisted, he pinched her thigh harshly. Thinking it might be a deterrent, she suggested she had a venereal disease. He then inserted his penis into her mouth and warned that he would not leave until both of them had an orgasm. After several minutes, he turned her in a different direction and repeated the act. At some point she began to hyperventilate, and said she felt as if she were going to have a heart attack; he responded by choking her. Finally, he ejaculated and said it was safe for him to leave.

He asked where her purse was; she told him. He left the room then returned; she heard the contents of her purse being "dumped" on the ironing board. He asked if she had any money; she said no.[3] He said he would take her driver's license and that he would return it in three weeks if she did not contact the police. He mentioned something about not wanting to leave fingerprints, and apologized, claiming he felt "ashamed" for what he had done. She then heard him unplug the telephone, and he proceeded to tie her arms and legs behind her back with the cord. He flushed the ashtray contents down the toilet, and told her to give him 10 minutes before she tried to undo herself, and told her not to telephone the police.

She waited several minutes after he left then tried to undo the knots. She telephoned a friend who then summoned the police. Later she discovered that he had entered through the bathroom window, which had been closed earlier that evening.[4] About three weeks later she found her driver's license on top of her newspaper.

*July 15, 1982 (counts 17-25)*

In July of 1982, Joyce M. and Lisa D. lived together in a ground floor apartment at the Shadow Oaks Apartments in Cupertino. In the early morning

---

[2]The man's voice "gravitated" between nice, angry, nervous, hysterical, vicious and violent. Shawn did not notice any body odor on the man. When asked if she noticed any accent, she responded: "[N]o, not that I recall, but . . . he was so agitated all the time as was I. I doubt that I would have noticed if he had any accent." He used a great deal of "slang" and "four-letter words," but did not refer to her as "'honey,'" "'darling,'" "'sweetheart'" or "'blondie.'"

[3]In fact she had $25; later she found the money was missing from her purse.

[4]The window screen had been torn or cut; the police found it 100 feet away from the window.

of July 15, Joyce returned home about 1:30 and went to bed; Lisa was already asleep. Sometime thereafter, Lisa was awakened by a man in her bedroom; she panicked and hit him. He grabbed her, covered her mouth and nose, ordered her to be quiet and said he would not hurt her. When she said someone else lived in the apartment, he moved Lisa to Joyce's bedroom.

Lisa told Joyce the man "was serious" and to do what he said. The man told Joyce not to look at him, and then told the women that he would not hurt them. He stated that he was only "running from some people," that he had just made a "cocaine" deal which had gone awry and that he had been shot. He had entered their apartment to hide from the men who were chasing him.

He blindfolded the women with clothing and had them place pillowcases over their heads. He asked if they had a gun in the house. He then led the women to the living room where he had them lock the doors and disconnect the telephone. He continued telling them that he had been shot, which they initially believed, until he became theatrical.[5]

He drank some of their tequila and smoked marijuana, saying that it was "homegrown." At one point he dropped a glass in the kitchen sink and said, "'Shit, John, break the glass why don't you.'" Over a substantial period of time he conversed with the women, with his tone of voice changing from apologetic to hostile. He stated that his last request was to see two women making love, but they were able to "stall him" and he changed the topic. He referred to the women as "darlin" and spoke with a "cowboy kind of talk." He stated that he was married, lived in Mountain View, and frequented two bars in Campbell, the Lariat and the Bodega.

In the bedroom, he demanded they remove their clothing, and forced Joyce to orally copulate him. Then he ordered the women to get on top of each other; they feigned orally copulating one another. The women then were forced to take turns orally copulating him; simultaneously he would fondle the other woman. He inserted his penis into Lisa's vagina and orally copulated her. Then he returned to the joint oral copulation. At various times he would leave the room, and then return saying that he was afraid of being killed and threatening the women with the gun. One time he returned with a bottle of deodorant and inserted it into each of their vaginas. He then inserted his penis into Lisa's vagina one more time.

---

[5]For instance, he fell against the wall in the kitchen and claimed to be dying; he made raspy noises as if he were choking and then would "forget" and his voice would return to normal. He poured water on his shirt and had Joyce touch it, telling her it was blood.

Before leaving the apartment, he asked the women if they had any guns, and searched the apartment. He found Lisa's purse and said that he would take their "I.D.'s" and mail them back. In fact, he did not take either women's license. He took $25-30 in cash from Lisa's wallet, $7 from Joyce's purse, and $350 from her bedroom. Using sashes and cords, he bound their hands and feet behind their backs, and then tied the women together. He told them not to telephone the police then pretended to leave; he returned once more saying they were "good girls" and warning them not to try anything. After ten minutes, they were able to free themselves and telephone the police.

Later the women found a cigarette ground into their carpet; neither of them smoked. The police determined that the point of entry was an unlocked sliding glass door.

Neither woman was able to identify the perpetrator. Both women noticed that he had a "little bump" on his penis.

*January 5, 1983 (count 26)*

Karen Lynn H. testified that on January 5, 1983, she was living in a ground floor apartment at the Cardiff Apartments in Campbell. About 11:30 p.m., while taking a shower, she heard a "crashing noise"; she continued with her shower then heard the noise again. She wrapped a towel around herself and walked to the bedroom door. From there she saw defendant leaning into the living room over a broken window. He gestured and asked her to come to him; instead, she telephoned the police. The police arrived five minutes later. By this time, defendant was gone. Her drapes had been opened, they were bloodied, and there was glass on the floor. The window screen was lying outside on the ground.

A neighbor, Chris Avila, heard the sound of breaking glass and went outside to investigate. When he rounded the corner near Karen's apartment, he saw defendant pulling his hand out of her window. Defendant saw Avila and immediately "produced" a knife and "held it out against" Avila in a bloodied hand. Avila asked what was going on and defendant put the knife away. Defendant began explaining that a "'couple of guys just jumped the fence.'" Avila suggested that they call the police and told defendant to "'Come on.'" Defendant followed Avila to another apartment where Avila telephoned the police. Avila relayed defendant's description of the two culprits to the police, all the while not believing a word defendant said,[6]

---

[6] According to Avila the wooden fence was six feet tall and he would have heard the noise had two men jumped over it.

while an occupant cleaned defendant's hand. About that time, the police arrived. Avila explained what had happened, and defendant was arrested.

Another neighbor, Cynthia Vaughn, testified that she heard the breaking glass shortly after 11 p.m. She looked out her window and saw defendant leaning into Karen's window and saying something like, "'Is anybody home.'" He appeared to have a soda pop bottle in his hand.

The police found a coke bottle cap and a knife in defendant's right hand pocket. A coke bottle was found on the ground near Karen's apartment. Defendant's fingerprint was found on two places on the outside of the window.

On January 25, 1983, defendant was arrested in his mother's apartment at 202 Calvert Street in Campbell.[7] During a pat-search, the defendant told the officer that "'[t]here's grass in here,'" meaning marijuana. Defendant had a small quantity in his pocket. A search of defendant's bedroom revealed three .38 caliber cartridges, an empty package of Camel cigarettes, levi-type pants, numerous baseball hats, and many belts, some with heavy "Western" type belt buckles. On January 5, 1983, Campbell Police Sergeant Dipell spoke with defendant. He described defendant's voice as "primarily mumbling, as having . . . somewhat of a drawl to it." He noticed the same speech pattern on January 25.

Dr. Wayne Chan, a dermatologist, testified that he examined defendant on August 13, 1981, and diagnosed that defendant had psoriasis on his genital area. At that time, defendant had a lesion on the proximal head of his penis near the shaft. He proscribed topical ointment for the condition and defendant never returned. Psoriasis is a persistent condition, but it can go into remission. Usually the lesions are raised but if medication is being used, then the lesions become flatter.[8]

B.

*Defense Case*

Defendant denied committing each of the charged crimes.

To explain his palmprint in Kathryn and Victoria's apartment, he testified that on March 25, 1981, he sold a motorcycle and some parts. He then

---

[7]This was the same apartment complex Joyce and Lisa lived in.

[8]Defendant listed his address on his form with Dr. Chan as 1307 Dale Avenue in San Jose. Defendant explained he used that address, the home of his girlfriend's parents, as a mailing address.

celebrated the sale with friends, Doug Higbe and Chris Buckelew at the Saddle Rack Bar in San Jose. After the celebration he returned to where he had left his car; the parking lot of the Lincoln Gate Apartments in Campbell where Buckelew lived. There he found a "gentleman" sitting inside the car. Defendant and Higbe gave chase but could not find the man. He had taken a shotgun and $1,450. They drove around the complex next door, the Cardiff Apartments, but did not find the man. The next day, he returned to the Cardiff and watched three apartments, in which his "friend" had suggested the perpetrator might be. After sitting in the parking lot from 7 a.m. to 3 or 4 p.m., he knocked on a particular apartment three different times, but received no answer. He pulled off the window screen, unlocked the door, knocked again, waited, then entered the apartment. He did not find either the shotgun or the money. He telephoned Higbe to make sure that the person had gone "to that particular place," and Higbe said, "he was almost positive," and then defendant left the apartment.

Defendant presented an alibi for the evening of March 28 and early morning of March 29, 1981. He testified that during the evening, he attended a family birthday party and then returned home with his girlfriend, Jill Hansen, and slept until the following morning.

Defendant's brother, a deputy sheriff, corroborated that defendant attended the birthday party and left about 11 p.m. with Hansen.[9] Hansen stated that she and defendant left together about 11 p.m., and went directly to sleep in a twin bed in defendant's bedroom. She did not notice defendant leaving the bed during the evening and stated that he was in bed when she awoke the following morning at 8 or 9 a.m.

Defendant's mother, who also attended the party, testified that defendant and Hansen were asleep when she arrived home sometime after 11 p.m. She stated that she is a light sleeper and would have noticed if defendant had gotten up in the evening. She further added that defendant was still in bed when she awoke at 5:30 a.m. to get ready for work.

Defendant testified that on July 14, 1982, he worked on a racing go-cart at his friend Bruce Paulson's house. In the evening, driving his mother's automobile, he went looking for Bill Lorenze and Butch Kucar. He locked his keys in the car at one point, and attempted to open it with a coat hanger. The police arrived and questioned him; eventually advising him not to drive because he was intoxicated. He arrived home at his mother's apartment between 2 and 2:30 a.m. on July 15. His mother was awake and he told her what had happened. He then went to bed.

---

[9]A video tape of the party showing defendant's presence was shown to the jury.

Defendant's mother corroborated that he had her car on the evening on July 14, 1982, and that he arrived home about 2 or 2:30 a.m. She believed that he was still in the apartment when she awoke at 5:30 a.m.

Campbell Police Officer Steve Austin testified he spoke with defendant about 1:45 a.m. on July 15, 1982, near 978 Ravens Court in Campbell. Defendant told him that he was looking for a motorcycle; he did not mention that he had been locked out of his car.

Defendant testified that on January 5, 1983, he went fishing with Jerry Savullo during the day and early evening. Later in the evening they dropped by Hansen's house,[10] and then went to the Cardiff Apartments in Campbell to look for Bill Lorenze, who owed defendant $150.[11]

While looking for the apartment of Lorenze's girlfriend, defendant heard what sounded like a window breaking. He saw someone look around the corner of the building, and he went to investigate. About four or five feet away from the man, he threw "something" at defendant, maybe a piece of glass, which cut defendant's finger. The man then "jumped the fence." Defendant then saw the broken window. He pulled away the broken glass, moved the curtains, looked inside, and asked if anyone was home. At that point, Avila arrived. Defendant denied pointing a knife at him.[12]

Savullo corroborated defendant's version of the events up to the arrival at the apartment. After defendant left the car, he fell asleep until the police arrived.

The police returned to Karen's apartment on January 5, after interviewing defendant. Although there was still glass on the ground, they did not find a piece of glass as described by defendant.

*Rebuttal*

During an interview with defendant following his arrest on January 4, 1983, defendant was specifically questioned about how many times he had been at the Cardiff Garden Apartments: defendant said he had been there twice in his lifetime; once on the day of his arrest after the Karen H. incident, and once about two or three weeks earlier. He was asked to explain

---

[10]Hansen stated that they came to her house about 9:30 or 10 p.m.

[11]William Lorenze corroborated that he owed defendant $150 at that time. He added that he had told defendant that his girlfriend resided in the Cardiff Apartments, even though she did not, to prevent defendant from collecting the debt.

[12]Defendant admitted having a fishing knife on his person, however.

how his palmprint had been found in another apartment of the complex. Defendant answered, "'That is impossible.' . . . 'It couldn't possibly be my print. I have never been there.'"

## II.

### *Denial of the motion to sever*

Prior to trial, defendant unsuccessfully moved to sever counts 1 to 13, 14 to 16, 17 to 25 and 26 requesting, in other words, that the four crime sets be tried separately. On appeal, defendant concedes that the four crime sets were properly joined under section 954[13]; the sole contention is that the trial court abused its discretion in refusing to sever them.

Because, as defendant concedes, joinder of the four sets of crimes was proper, the denial of the motion to sever may be disturbed on appeal only upon a showing of an abuse of discretion resulting in "substantial prejudice" to the defendant. (*People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752]; accord *People* v. *Poon* (1981) 125 Cal.App.3d 55, 69 [178 Cal.Rptr. 375]; *People* v. *Savala* (1981) 116 Cal.App.3d 41, 50-51 [171 Cal.Rptr. 882].) Further, the propriety of the denial of the motion to sever must be tested on the basis of what was known to the trial judge at the time the motion was ruled upon, not on subsequent trial developments. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480], mod. 41 Cal.3d 144; *People* v. *Brawley* (1969) 1 Cal.3d 277, 292 [82 Cal.Rptr. 161, 461 P.2d 361]; *People* v. *Wallace* (1970) 13 Cal.App.3d 608, 617 [91 Cal.Rptr. 643].)

The path to be taken in reviewing a denial of a motion to sever was mapped out in detail by the California Supreme Court: "The initial step in any review of a motion to sever is to examine the issue of cross-admissibility of evidence. Since cross-admissibility would ordinarily dispel any possibility of prejudice [citations], we must inquire, had the severance motion been granted, would the evidence pertinent to one case have been admissible in the other under the rules of evidence which limit the use of character evidence or prior similar acts to prove conduct (Evid. Code, § 1101, subds. (a) and (b))." (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 448 [204 Cal.Rptr.

---

[13]Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts. . . ."

700, 683 P.2d 699] [fn. omitted][14]; accord *People* v. *Balderas, supra,* 41 Cal.3d at p. 172.)

It was apparent that here the fundamental issue in the first three crime sets was the identity of the perpetrator; the fundamental issue in the last crime set was defendant's intent to rape. We first analyze cross-admissibility on the issue of identity.

■ Where a primary issue of fact is whether or not the defendant was the perpetrator of the charged crime "evidence of other crimes is ordinarily admissible if it discloses a distinctive *modus operandi* common to both the other crimes and the charged crime." (*People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91], italics in original.)

The factors pertinent to the evaluation of whether other-crimes evidence raises the inference that the perpetrator of them was also the perpetrator of the charged offense were carefully delineated by the *Haston* court: "It is apparent that the indicated inference does not arise . . . from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (*Id.,* 69 Cal.2d at pp. 245-246; accord *People* v. *Rivera* (1985) 41 Cal.3d 388, 392 [221 Cal.Rptr. 562, 710 P.2d 362]; *People* v. *Alcala* (1984) 36 Cal.3d at p. 604, 632 [205 Cal.Rptr. 775, 685 P.2d 1126]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on another ground in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)

---

[14]Evidence Code section 1101 provides in pertinent part: "(a) . . . [E]vidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

The probative value of the other-crimes evidence exists "only to the extent that *distinctive* 'common marks' give logical force to the inference of identity." (*People* v. *Haston, supra,* at p. 247, italics in original.) In other words, the strength of the inference is dependent upon two factors: (1) the degree of distinctiveness of the shared marks; and (2) the number of minimally distinctive shared marks. (*Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 450; *People* v. *Thornton, supra,* 11 Cal.3d at p. 756; *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 137 [172 Cal.Rptr. 86], cert. den., 451 U.S. 988 [68 L.Ed.2d 846, 101 S.Ct. 2325]; *People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 463 [161 Cal.Rptr. 634].)

Finally, where the inference of identity is weak, the trial court must exercise its discretion in favor of exclusion, because the prejudicial effect of the other-crimes evidence is "always manifest." (*People* v. *Thornton, supra,* 11 Cal.3d at p. 756; see also *People* v. *Banks* (1970) 2 Cal.3d 127, 138 [84 Cal.Rptr. 367, 465 P.2d 263]; *People* v. *Haston, supra,* at p. 247.)

Looking initially at the first three crime sets, there is no doubt that if each set had been tried separately, evidence of the uncharged two would have been admissible in the trial of the third.

The pattern of the perpetrator of each was to enter the apartment through a window or a sliding glass door, at nighttime, tell the victim(s) that he had just participated in a cocaine transaction which had gone awry and only wished to hide, to blindfold the victim(s), be armed with a gun or tell the victim(s) he was so armed, discuss lesbianism or have the victim(s) perform lesbian acts, bind the victim's hands and feet with available material, either telephone cords or fabric, then take money and identification (or profess to take identification) from the victim's purse. When considered in combination, these acts deliver a distinctive pattern from which it is reasonable to draw the inference that each was perpetrated by the same individual.

We agree with defendant that dissimilarities in the three crime sets existed. For instance, in the first and third sets, the sexual offenses were rape, oral copulation and penetration with a foreign object, whereas in the second one, the only sexual offense was oral copulation. In the first and third crime sets, the perpetrator spoke with a cowboy drawl, whereas in the second, the victim did not notice any accent. In the second and third, the perpetrator smoked cigarettes, whereas in the first, he did not smoke. Nevertheless, it is not a prerequisite for admission of other crimes evidence that the activities be identical. Rather the test is distinctive similarity. We find that test to be met here. Accordingly, the three crime sets would have been cross-admissible on the issue of identity.

■ · The remaining crime to be considered is the last: in the trial of the first three sexual offenses would proof of the single burglary be admissible to prove identity? Yes. Here each crime was begun in the same way: the perpetrator attempted to enter an apartment at nighttime through a window. Because the initial steps are identical to those of the other crimes, proof of the last burglary would be admissible to show that defendant was the perpetrator of the first three offenses.

We now turn to the question of whether the first three crimes would have been admissible in a separate trial of the last burglary to show defendant's entry was for the purpose of committing rape. The question is whether evidence of those crimes was "'. . . logically relevant to prove defendant's intent *in this case*.'" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 319 [165 Cal.Rptr. 289, 611 P.2d 883], italics in original; *People* v. *Schader* (1969) 71 Cal.2d 761, 775 [80 Cal.Rptr. 1, 457 P.2d 841].) As this court noted in *People* v. *Jackson* (1980) 110 Cal.App.3d 560, 566 [167 Cal.Rptr. 915], the determination of relevancy rests on whether there was sufficient similarity between the charged and uncharged offenses to support the inference that defendant "probably harbored the same intent in both instances." (See also, *People* v. *Thompson, supra*, 27 Cal.3d at p. 319.) Our analysis is the same: because the initial steps of the burglary were mirror images of the initial steps of the first three crimes in which defendant committed forcible sexual acts on the residents, a reasonable trier of fact could conclude that he probably harbored the same intent in the final burglary.

In sum, we agree with the trial court's conclusion at the time of the motion to sever that had a severance been granted evidence of each set of crimes would have been admissible in the trial of the others. Denial of the motion to sever, therefore, was not an abuse of discretion.

### III.

*Introduction of evidence that defendant possessed a small amount of marijuana when he was arrested*

■ Over defense objection, the prosecutor was allowed to introduce evidence showing that upon his arrest on January 25, 1983, defendant possessed a small amount of marijuana. The prosecution's theory of relevance was that possession of marijuana has some tendency in reason to show that he was the perpetrator of the third crime set on July 15, 1982, because the perpetrator there had smoked marijuana. The trial court agreed with that theory and instructed the jury that the evidence was being admitted only for that limited purpose.[15]

---

[15]The court instructed the jury at the time: "[T]he evidence you are about to hear is admitted for the sole and limited purpose of identity and for no other reason, and you will consider that admonition and I will so advise you during the instructions as well."

Assuming for purpose of argument that admission of that evidence was error, prejudice to defendant has not been shown. The nature of that other crimes evidence is not highly inflammatory. As defense counsel pointedly elicited on cross-examination of the police officer, it is not uncommon to find an arrested person in possession of marijuana: the officer himself had experienced that in some 500 arrests. Further the jury was instructed it could consider that evidence only for the limited purpose of showing identity and not for criminal disposition.

Under such circumstances, if admission of the evidence was error, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of such an error. Any error was therefore harmless. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## IV.

### *Sufficiency of the evidence*

Defendant next urges that there is no substantial evidence to support the verdicts on the first 25 felony counts.[16] In his view, the only evidence tying him to the crimes was the palmprint found in the first apartment, and he argues, citing *People v. Flores* (1943) 58 Cal.App.2d 764, 770 [137 P.2d 767]: "No man's liberty should be taken from him upon such a flimsy showing as characterizes the evidentiary features of this case."

When the sufficiency of the evidence to support jury verdicts is challenged on appeal, the role of the reviewing court is well settled: "the court must review *the whole record* in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; accord *People v. Thompson, supra,* 27 Cal.3d at pp. 322-323; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].)

The People may, of course, rely upon circumstantial evidence to connect a defendant with the commission of a crime and to establish beyond a reasonable doubt that he committed it. (*People v. Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91]; *People v. Reilly* (1970) 3 Cal.3d 421, 424 [90 Cal.Rptr. 417, 475 P.2d 649].) If the People rely upon cir-

---

[16]He does not challenge the burglary conviction as to Karen H.

cumstantial evidence to prove their case, the test on appeal is the same: is there substantial evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253]; accord *People* v. *Cole* (1985) 165 Cal.App.3d 41, 49-50 [211 Cal.Rptr. 242].) "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant reversal of the judgment."'" [Citations.]" (*People* v. *Reilly, supra*, 3 Cal.3d at p. 425.)

■ There is no doubt that defendant was the perpetrator of the last crime: he was caught in the act. As to the first crime his palmprint was found in the apartment; that was strong circumstantial evidence that he was the perpetrator. Defendant counters that he himself admitted to being in the apartment a few days before the crime and to using the telephone, and that all the palmprint established was "at some time he was present there and placed his hand on the telephone." That characterization of the weight of the palmprint would make some sense if defendant had routine access to the apartment. Here, however, defendant did not own the apartment, did not have routine access to it, and did not know the women who occupied it. Instead he was a stranger to them. He attempted to explain the presence of his palmprint, but the jury was not required to accept his testimony as true. Evaluating his credibility was exclusively their province and they were free to disbelieve and disregard his version of how his palmprint got there. (Cf. *People* v. *Pierce, supra*, 24 Cal.3d at pp. 210-211.)

In short we find substantial evidence to support the convictions of the crimes involved in the first crime set. As to the second and third because the method of their commission was so distinctively similar to that of the first crime set, it was reasonable for the jury to infer that defendant was the perpetrator of those as well.

For these reasons, we conclude that substantial evidence supports the verdicts on counts 1 through 25.

V.

*Admission of Kathryn's testimony*

Defendant next contends that the trial court committed reversible error under *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775], in allowing Kathryn to testify because shortly after the crime she had been hypnotized for the purpose of enhancing her recall of the perpetrator's identity.

In *People* v. *Shirley,* the California Supreme Court held the "testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." (*Id.,* 31 Cal.3d at pp. 66-67; accord *People* v. *Brown* (1985) 40 Cal.3d 512, 527-528 [220 Cal.Rptr. 637, 709 P.2d 440].) But, according to the court, "if the prosecution should wish to question such a witness on a topic wholly unrelated to the events that were the subject of the hypnotic session, the testimony as to that topic would not be rendered inadmissible by the present rule." (At p. 67.)

The Attorney General responds that the instant case falls within this exception to the *Shirley* exclusion rule. We agree in part.

The record reveals that Kathryn's therapist decided to hypnotize her shortly after the crimes in order to "see if under [an] hypnotic state she might be able to recall what the man looked like that assaulted them." According to the therapist, the method she normally employs in conducting hypnosis is "to steer the victim away from the assaultive event and focus them on [the] identification, . . . I [have] found that there is no need for them to relive that sort of cruel trauma."

Prior to hypnotizing Kathryn, the therapist discussed with her what had happened that evening, "[B]efore I hypnotized her I got just a general sequence of the events of what had happened, . . ." During those conversations, Kathryn had been unable to identify the perpetrator. The therapist believed she asked Kathryn to tell her when she thought she would have had the best opportunity to see her assailant's face. According to Kathryn, that time would have been when he originally jumped on her in the bedroom. Thus, when Kathryn underwent hypnosis, the therapist "oriented" her to that point in the attack. This orientation by the therapist went along the following lines, "'Asleep, hear the floor creak, saw someone, said Vickie? He said yeah. Realized this is a stranger. Said who are you? Screamed Vickie. Jumped on her, grabbed neck. Shut up or I will kill you. She said okay. He said tell her it is okay. She said it is okay. And then he went and sat on the couch.'" No other events of the crime were mentioned during the session.[17]

As the foregoing reveals, the hypnosis touched upon the events of the crime up until the perpetrator sat down on the couch. From that moment

---

[17]During trial, the prosecution specifically refused to question Kathryn regarding identification, which had been their game plan from the beginning. The defense, however, did raise the question upon losing their motion to exclude Kathryn's entire testimony.

on, the entire focus of the session was on attempting to enhance Kathryn's recall of the features of the perpetrator. Does the *Shirley* rule prohibit Kathryn from testifying to the entire transaction? We think not. Instead we believe *Shirley* required exclusion only of Kathryn's testimony regarding identification and all matters of the crime up until the point the perpetrator sat on the couch. But, nothing in *Shirley* compels the exclusion of testimony regarding the events which occurred thereafter.

Thus, the trial court erred in allowing Kathryn to testify as to the events leading up to and including the perpetrator sitting on the couch.

That testimony, in great part, was corroborated by Victoria. Most of the testimony concerned purely background matters which were not relevant to the elements of the charged crimes, save and except the burglary, the elements of which were also established by Victoria's testimony. We conclude, therefore, that it is not reasonably probable that a result more favorable to defendant would have been reached had that testimony been excluded. (Cf. *People* v. *Brown, supra,* at p. 528 [text and fn. 2]; *People* v. *Guerra* (1984) 37 Cal.3d 385, 429 [208 Cal.Rptr. 162, 690 P.2d 635]; *People* v. *Shirley, supra,* at p. 70.)

## VI.

### *Sentencing*

Defendant raises a myriad of attacks on his sentence of 106 years and 4 months in state prison, and argues that as a minimum, the matter should be remanded for resentencing. We conclude that no reversible error occurred in sentencing and that there is no constitutional infirmity in the length of sentence imposed by the trial court.

The complex sentencing scheme employed by the trial court is set forth in Appendix A to this opinion. As will be noted, the trial court employed three methods in imposing consecutive sentences: (1) section 667.6, subdivision (d), which requires a full, separate consecutive term for violent sex offenses where "such crimes involve separate victims;" (2) section 667.6, subdivision (c), which gives the trial court discretion to impose a full, separate and consecutive term for violent sex offenses "whether or not the crimes were committed during a single transaction;" and (3) section 1170.1, subdivision (a), the so-called principal-subordinate consecutive sentencing scheme.

### A. *Adequacy of the reasons for imposing full consecutive sentences under section 667.6, subdivision (c)*

The California Supreme Court has required two statements of reasons when the court decides to impose full consecutive sentences under

the discretionary authority of section 667.6, subdivision (c): (1) a statement of reasons for the choice of imposing a consecutive sentence rather than a concurrent one; and (2) a statement of reasons for the choice of imposing a consecutive sentence under the harsher full term provision of subdivision (c) of section 667.6 rather than a consecutive sentence under the more lenient principal-subordinate scheme of section 1170.1, subdivision (a). (*People* v. *Belmontes* (1983) 34 Cal.3d 335, 348 [193 Cal.Rptr. 882, 667 P.2d 686]; accord *People* v. *Smith* (1984) 155 Cal.App.3d 539, 543 [202 Cal.Rptr. 259]; *People* v. *Reeder* (1984) 152 Cal.App.3d 900, 912 [200 Cal.Rptr. 479].)

Defendant does not claim that the trial court failed to comply with *Belmontes*. Instead, the claim is that the trial court's reasons for imposing full consecutive sentences under section 667.6, subdivision (c) on counts 6, 7, 12, 13 and 21 were "insufficient, whether taken individually or together." We disagree.

The trial court gave the following reasons for its sentencing choice: (1) "the serious nature of these offenses and the need to protect society;" (2) "the Court considers the defendant a danger to society;" (3) "not only were there multiple sex acts committed against each victim but the acts themselves were different in nature;" (4) "the period of captivity in these cases . . . [was] extensive. . . ."

Contrary to defendant's assertion, the trial court was not required to specify which rule or rules of the California Rules of Court it was relying upon. Rule 443 merely requires the trial court to "state in simple language the primary factor or factors that support the exercise of discretion. . . ." (Cal. Rules of Court, rule 443.) Indeed, error is routinely found where the trial court merely refers to factors by rule number. (See, e.g., *People* v. *Enright* (1982) 132 Cal.App.3d 631, 636 [183 Cal.Rptr. 249] [and cases cited therein].)

Defendant next chastises the trial court for failing to specify what facts rendered these sexual offenses "'distinctively worse' than the 'average' violent sex crime" of this nature, citing, *People* v. *Price* (1984) 151 Cal.App.3d 803, 813 [199 Cal.Rptr. 99]. In *Price*, the Court of Appeal required such specification where the trial court was attempting to rely on the aggravating factor that the crime involved acts disclosing a high degree or cruelty, viciousness or callousness (Cal. Rules of Court, rule 421(a)(1)); here the trial court did not rely upon that factor. Error under *Price*, therefore, did not occur.

■ Defendant also challenges the trial court's stated reasons for choosing consecutive sentences generally on these six counts. In imposing con-

secutive sentences on each count the court gave the same reasons: (1) the crime involved the threat of great bodily injury; (2) "the victims, young, in their own home at nighttime were particularly vulnerable"; (3) the planning, sophistication or professionalism with which the crime was carried out indicate premeditation; (4) the crimes involved multiple victims; and (5) the convictions for which sentence was to be imposed were numerous. Each reason in the abstract is a proper one for imposing a consecutive sentence rather than a concurrent sentence. (Cal. Rules of Court, rules 425(a)(4), 425(a)(5), 425(b), 421(a)(1), 421(a)(3).)

As to these sentence choices defendant complains because the court used the same factors for each consecutive sentence. So long as the criterion fits, there is nothing wrong with using it to impose more than one consecutive sentence. (*People* v. *Smith, supra,* 155 Cal.App.3d at p. 546; *People* v. *Bejarano* (1981) 114 Cal.App.3d 693, 705 [173 Cal.Rptr. 71].) ▮ He also argues that the trial court's statement of reasons for imposing consecutive sentences generally on these counts "is certainly not a statement of reason separate and apart from the decision" to impose full consecutive sentences under the section 667.6, subdivision (c) scheme. Again we disagree. *Belmontes* quite clearly allowed use of the same criteria by the sentencing court in deciding to impose consecutive sentences generally and in deciding to utilize the harsher consecutive sentencing scheme of section 667, subdivision (c). (*People* v. *Belmontes, supra,* 34 Cal.3d at p. 348.) Here the trial court relied on different factors for the two sentencing decisions and necessarily complied with the requirement of providing a separate statement of reasons for the two sentencing choices.

▮ Defendant also complains that the trial court's recitation of ultimate facts without elaboration is inadequate because such an approach to sentencing fails to facilitate appellate review and fails to ensure careful decision making.

Rule 443 of the California Rules of Court requires the court to "state in simple language the primary factor or factors that support the exercise of discretion. . . . The statement need not be in the language of these rules."

While the reviewing court has found fault with the trial courts who merely incorporate probation reports or written material instead of stating its reasons on the record (*People* v. *Salazar* (1980) 108 Cal.App.3d 992, 1000 [167 Cal.Rptr. 38]; *People* v. *Hernandez* (1979) 100 Cal.App.3d 637, 643 [160 Cal.Rptr. 607]) and have criticized trial courts which merely recite the numbers of the relevant rules of court (*People* v. *Enright, supra,* 132 Cal.App.3d at p. 636), we have been cited no case which finds error when

a trial court uses the language of the rules in reciting its reasons for the sentencing choice.

A reviewing court would prefer elaboration, of course, where the applicability of a provision of the rule of court to the facts of the case is not patently obvious. For instance, where the court cites the multiple victim provision, further elaboration is not needed to facilitate appellate review. But where the court uses a criterion such as that the victim was particularly vulnerable, further elaboration would be extremely helpful in facilitating review of the trial court's decision. Here the trial court did elaborate on that factor, by specifically noting that the victims were young and were in their own homes at nighttime.

■ We now turn to the last challenge in this area: that the cited reasons for imposing consecutive sentences generally are not supported by the record. Although defendant makes this broad challenge, his argument is focused only on the trial court's finding that within the meaning of rule 421(a)(3) the victims were particularly vulnerable. Presumably the argument here is that these victims were no more vulnerable than the normal victim of a sexual assault.

"Particularly, as used here, means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act. An attack upon a vulnerable victim takes something less than intestinal fortitude. In the jargon of football players, it is a cheap shot." (*People* v. *Smith* (1979) 94 Cal.App.3d 433, 436 [156 Cal.Rptr. 502]; accord *People* v. *Simon* (1983) 144 Cal.App.3d 761, 765 [193 Cal.Rptr. 28].)

There simply is no question but that a woman asleep in her darkened residence is more vulnerable than a woman fending off a rapist on a dark street or in a public restroom. (Cf. *People* v. *Salazar* (1983) 144 Cal.App.3d 799, 813 [193 Cal.Rptr. 1].) We agree with the trial court that the victims here were vulnerable, and particularly so.

### B. *Multiple enhancement for use of a gun*

■ Defendant next challenges the trial court's decision to enhance, for use of a gun, counts 1, 4, 5, 6, 7, and 8. In his view that multiple enhancement violates the rule of *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23], which prohibits enhancement on more than one offense where "all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, . . ." (*Id.*, at p. 333; accord *People* v.

*Cardenas* (1982) 31 Cal.3d 897, 913 [184 Cal.Rptr. 165, 647 P.2d 569]; *People* v. *Chavez* (1980) 26 Cal.3d 334, 335 [161 Cal.Rptr. 762, 605 P.2d 401]; *People* v. *Miller* (1977) 18 Cal.3d 873, 887 [135 Cal.Rptr. 654, 558 P.2d 552].)

With respect to the sexual offenses (i.e., counts 4, 5, 6, 7, 8) the *Culbreth* rule has no application. Subdivision (i) of section 1170.1 provides in pertinent part: "For any violation of subdivision (2) or (3) of Section 261, . . . Section 289, or sodomy or oral copulation by force, violence, duress, menace or threat of great bodily harm as provided in Section 286 or 288a, *the number of enhancements which may be imposed are not limited, regardless of whether such enhancements are pursuant to this or some other section of law. Each of such enhancements shall be a full and separately served enhancement and shall not be merged with any term or with any other enhancement.*" (Italics added.)

Although the Supreme Court has not yet had the opportunity to interpret this subdivision and decide whether it has overruled the *Culbreth* rule with respect to the sexual offenses listed therein, it has strongly suggested that that is the case. (See *People* v. *Cardenas, supra,* 31 Cal.3d at pp. 913-914 [text and fn. 9].) The Court of Appeal, however, has reached the question. Thus, in *People* v. *Fitch* (1985) 171 Cal.App.3d 211 [217 Cal.Rptr. 197], the court held that section 1170.1, subdivision (i) authorizes multiple gun-use enhancements for sexual offenses given full consecutive sentences under section 667.6, subdivision (d) and evidences a clear legislative intent to create an exception to the *Culbreth* rule for these sexual offenses. (*People* v. *Fitch, supra,* at pp. 214-215.) Similarly, *People* v. *Bergman* (1984) 154 Cal.App.3d 30 [201 Cal.Rptr. 54], held the same with respect to sexual crimes sentenced under section 667.6, subdivision (c). (*Id.,* at pp. 36-38.)

There are cases to the contrary, (see, e.g., *People* v. *Rodriguez* (1984) 160 Cal.App.3d 207 [206 Cal.Rptr. 563]; *People* v. *Carter* (1983) 144 Cal.App.3d 534, 542 [193 Cal.Rptr. 193]) but we are not persuaded by their reasoning that by its terms, subdivision (i) of section 1170.1 applies only to sexual offenses sentenced under the principal-subordinate scheme.

Following *Fitch* and *Bergman* we hold that the trial court properly enhanced defendant's sentence for each sexual offense and in so doing did not violate the rule of *In re Culbreth*.

Nor do we find *Culbreth* violated in that the trial court also enhanced the robbery count (count 1) for use of the gun. As to that count, sentenced as a subordinate term pursuant to section 1170.1, subdivision (a), the court imposed an additional term of eight months for the gun use. We see nothing

improper in that enhancement, and defendant has failed to make any argument demonstrating why it would be.

### C. *Imposition of a full consecutive term pursuant to section 667.6, subdivision (d) for count 16*

In imposing a full consecutive term for count 16 (forcible oral copulation of Shawn B.) the trial court relied upon subdivision (d) of section 667.6, which by its term applies only where the sexual offenses "involve separate victims or involve the same victim on separate occasions." Defendant argues that this statutory scheme cannot apply to count 16 in that this count involved only one victim on one occasion.

In support of his claim, defendant cites *People* v. *Humphrey* (1982) 138 Cal.App.3d 881 [188 Cal.Rptr. 473] and *People* v. *Levitt* (1984) 156 Cal.App.3d 500 [203 Cal.Rptr. 276]. Neither case is on point. Each case was concerned with the applicability of rule 425(a)(4) of the California Rules of Court, which provides that a consecutive sentence may be imposed where the crimes involve multiple victims. The *Humphrey* court held that the rule only applied "to a situation where a defendant is convicted of two or more counts or crimes and at least one of those counts involves multiple victims." (*Id.*, 138 Cal.App.3d at p. 882.) *Levitt* merely followed that holding. (*Id.*, 156 Cal.App.3d at p. 517.)

Subdivision (d) of section 667.6 is distinctly different. In this scheme, the Legislature has prescribed that full and separate consecutive sentences must be imposed for each violation of the designated violent sexual offenses where the crimes "involve separate victims or involve the same victim on separate occasions." (§ 667.6, subd. (d); see *People* v. *Craft* (1986) 41 Cal.3d 554, 559 [224 Cal.Rptr. 626, 715 P.2d 585].) Here, of course, we are concerned with only the provision for "separate victims."

The plain meaning of the term "separate victims" is different, i.e., the crimes involved different victims. The statute makes no other requirement for its imposition. Thus, it does not matter whether the defendant commits his sexual acts upon more than one victim on the same day at the same time, or upon two victims a day apart. So long as there are two victims, subdivision (d) of section 667.6 applies.

That is obviously the case here. In addition to utilizing subdivision (d) of section 667.6 to impose a full separate consecutive sentence on count 16, the court utilized it to do the same on count 4 (forcible rape of Kathryn), count 5 (forcible rape of Victoria) count 20 (forcible rape of Lisa) and count

22 (forcible oral copulation of Joyce). We see no error in that sentencing scheme.

### D. *The aggravated terms on counts 4 and 5*

 Defendant next claims that the trial court gave no reasons for imposing the aggravated terms on count 4 (forcible rape of Kathryn) and count 5 (forcible rape of Victoria) but simply noted that the aggravating factors outweighed any factors in mitigation. The record belies defendant's contention that no reasons were given for imposing the aggravated term. As to count 4, the court noted that the victim was particularly vulnerable (Cal. Rules of Court, rule 421(a)(3)) and that the planning, sophistication and professionalism with which the crime was carried out indicated premeditation (Cal. Rules of Court, rule 421(a)(8)); each a valid aggravating factor. The court applied those rules as to the rape of Victoria and added a third factor: that the crime involved "threat of great bodily harm." (Cal. Rules of Court, rule 421(a)(1).)

It is true that as to each crime, the court commented that the factors in aggravation outweighed the mitigating factors, but the court failed to specify which mitigating factors, if any, it considered. This was not error.

### E. *Imposition of a consecutive sentence on count 26*

 Defendant's last sentencing claim is that the trial court erred in imposing a consecutive sentence for count 26 (burglary with intent to commit rape as to Karen H.) because the stated reasons are inapplicable.

In imposing a *consecutive* sentence for the crime, the court noted the following reasons: (1) the convictions for which sentence was to be imposed were numerous (Cal. Rules of Court, rule 425(a)(5)); and "the crimes were committed at separate places rather than being committed so close in time and place as to indicate a single period of [aberrant] behavior." (*Id.*, rule 425(a)(3).)

Defendant argues that because only one crime was committed as to this victim, the stated criteria are inappropriate. We fail to grasp the argument. Certainly, the convictions for which this trial court was sentencing this defendant were numerous—there were 26 in all. In the same vein, the four groups of crimes were committed at different places and did not indicate a single period of aberrant behavior. Each factor did apply to this case and each was properly relied upon by the trial court in imposing a consecutive term for this count.

## VII.

### *Cruel or unusual punishment*

■ Not surprisingly, defendant also contends that the sentence of 106 years and 4 months constitutes cruel or unusual punishment in violation of the United States (8th Amend.) and California (art. I, § 17) Constitutions. He argues that his sentence is in effect a sentence of life without possibility of parole, a sentence which is cruel or unusual both compared to the nature of the offender and to the nature of the offense.

An analysis of whether a particular punishment is cruel or unusual must begin with *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]. There, the California Supreme Court set forth the general rule that a particular punishment violates the California Constitution if, "although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id.*, at p. 424.) *Lynch* identified three techniques as an aid in determining whether the punishment is disproportionate: (1) the nature of the offense and/or the offender with particular regard to the degree of danger both present to society (*id.*, at p. 425); (2) a comparison of the challenged punishment with that prescribed in the same jurisdiction for different offenses which by their very nature must be deemed to be more serious (*id.*, at p. 426); and (3) a comparison of the challenged punishment to punishment proscribed for the same offense in other jurisdictions having an identical or similar constitutional provision (*id.*, at p. 427). Because defendant does not argue the third technique is applicable here, and does not provide us with any information on which to determine whether the punishment for multiple sex offenders in other jurisdictions is comparable to that in California, we confine our review to the first two techniques.

### *Nature of the offense and/or the offender*

■ An examination of the nature of the offenses committed here (e.g., forcible rape, forcible oral copulation, penetration with a foreign object, robbery, burglary with intent to commit rape) reveals that they are of the most serious, violent and heinous crimes imaginable both in the abstract and in the real world.

This technique also requires an examination of the manner in which the crimes were committed, "including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Foss* (1974) 10 Cal.3d 910, 919 [112

Cal.Rptr. 649, 519 P.2d 1073].) A quick look at the crimes here convincingly establishes that defendant is a danger to society; his motive, if you will, was sexual gratification, the crimes were committed in the most abhorrent way, his involvement was singular and the consequences of his acts are apparent from a reading of the victims' statements—their lives have been drastically altered by his conduct.

When examining the nature of the offender, the inquiry is on "such factors as his age, prior criminality, personal characteristics, and state of mind." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) In this regard defendant argues that his prior record is minimal—no prior felony convictions and six adult misdemeanor convictions. However, when this factor is weighed against the nature of the offenses he committed, and the manner in which he committed them, and the danger he posed to the community, it cannot be said that the sentence is so disproportionate to the offenses or the offender so as to shock the conscience of the court. (Cf. *People* v. *Bestelmeyer* (1985) 166 Cal.App.3d 520, 530-531 [212 Cal.Rptr. 605] [term of 129 years for 25 felony counts, including forcible sexual offenses not disproportionate to the offender who had no prior record, only victimized his stepdaughter, and was suffering from mental impairment at the time of the crimes].)

*Comparison of the punishment with that for more serious offenses in California*

Defendant argues that his sentence is the functional equivalent of life without possibility of parole in that he will not be eligible for parole until he is about 85 years old. He proceeds to compare his crimes with those also punished by the term of life without possibility of parole (i.e., murder with special circumstances (§ 190.2, subd. (a)), kidnapping for ransom with great bodily injury or death (§ 209, subd. (a)), treason (§ 37)) and contends that the punishment does not fit the crimes.

Perhaps this argument might be convincing if the punishment defendant received were for a single sexual offense. But this is not the case; it is the result of his conviction of multiple violent sexual offenses, involving five victims. The real challenge, therefore, lies with the full consecutive sentencing scheme of section 667.6, subdivisions (c) and (d). Justice Reynoso, writing for the majority in *People* v. *Karsai* (1982) 131 Cal.App.3d 224 [182 Cal.Rptr. 406], answers the contention aptly: "In enacting Penal Code Section 667.6 the Legislature has chosen to treat violent sex offenses and violent sex offenders in a manner different than other types of offenses and offenders. . . . The statute is directed at multiplicity of offenses by providing for full, separate, consecutive sentencing. In view of the outrageous nature of violent sexual offenses and the manifest danger to society from recidivism

and multiplicity of offenses, we cannot say that the severity of punishment is so disproportionate to the crimes so as to shock the conscience and offend fundamental notions of human dignity." (*Id.*, at p. 242 [26-year sentence for rape and oral copulation, enhanced by two prior sexual convictions not disproportionate]; accord *People* v. *Bestelmeyer, supra,* 166 Cal.App.3d 520 [129 years for 25 separate offenses not disproportionate].)

In sum, we find no constitutional infirmity in the sentence imposed in the instant case for the repeated, serious and violent sexual misconduct of this defendant.

## VIII.

*Reading of statements by the victims at the sentencing hearing*

■ At the sentencing hearing, over defendant's objection, the court allowed each victim to give a statement pursuant to section 1191.1.[18] None of the victims was placed under oath, and most simply read a statement to the court. Although defense counsel's request that he be allowed to cross-examine the victims was denied, the court was willing to make inquiries if defense counsel wanted it to; defense counsel did not take advantage of that opportunity.

On appeal defendant urges that this procedure denied him his Sixth Amendment right to confront the witnesses against him. It did not; there is no Sixth Amendment right in such circumstances. (*People* v. *Zikorus* (1983) 150 Cal.App.3d 324, 332-333 [197 Cal.Rptr. 509].)

■ Defendant also argues that the application of section 1191.1 to the instant case violates the ex post facto clause in that some of his crimes occurred prior to the effective date of Proposition 8. Although the provisions of Proposition 8 are inapplicable to the Kathryn B., Victoria D. and Sharon B. crimes because each occurred prior to June 9, 1982, (see *People* v. *Smith*

---

[18]Section 1191.1 was enacted on June 2, 1982, as part of the initiative measure commonly known as Proposition 8, or "The Victim's Bill of Rights." As originally enacted, it provides in relevant part: "The victim of any crime, . . . has the right to attend all sentencing proceedings under this chapter and shall be given adequate notice by the probation officer of all sentencing proceedings concerning the person who committed the crime. [¶] The victim . . . has the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his or her views concerning the crime, the person responsible, and the need for restitution. The court in imposing sentence shall consider the statements of the victims . . . and shall state on the record its conclusion concerning whether the person would pose a threat to public safety if granted probation."

The section has since been amended in a manner not relevant to the instant action. (See Stats. 1984, ch. 1425, § 1, p. —.)

(1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149] [Supreme Court construes Proposition 8 in its entirety as applying only to crimes committed after its effective date]) the ex post facto clause violation is not involved, for as noted by the California Supreme Court this provision of Proposition 8 is "clearly procedural both in form and effect, and would not be ex post facto as to prior crimes." (*People* v. *Smith, supra,* 34 Cal.3d at p. 261.) Nor can we imagine what prejudice defendant suffered by the trial court's application of section 1191.1 to all of the crimes, instead of only the post-Proposition 8 crimes. Under any standard of prejudice, the error was harmless.

The judgment is affirmed.

Anderson, P. J., and Channell, J., concurred.

A petition for a rehearing was denied May 27, 1986, and appellant's petition for review by the Supreme Court was denied August 14, 1986. Mosk, J., was of the opinion that the petition should be granted.

## APPENDIX A

| Count/Victim | Crime/Enhancement | Term |
|---|---|---|
| 1 – Residence of Kathryn and Victoria | First degree burglary | 1 yr., 8 mos.; (consecutive subordinate term § 1170.1, subd. (a)) |
| | Use of a gun (§ 12022.5) | 8 mos.; consecutive |
| 2 – Kathryn B. | Robbery | Stayed per § 654 |
| | Use of a gun (§ 12022.5) | Stayed per § 654 |
| 3 – Victoria D. | Robbery | Stayed per § 654 |
| | Use of a gun (§ 12022.5) | Stayed per § 654 |
| 4 – Kathryn B. | Rape | 8 yrs.; consecutive (§ 667.6, subd. (d)) |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs.; consecutive |
| 5 – Victoria D. | Rape | 8 yrs. (upper term); consecutive (§ 667.6, subd. (d)) |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs.; consecutive |

| Count/Victim | Crime/Enhancement | Term |
|---|---|---|
| 6 – Kathryn B. | Forcible oral copulation | 6 yrs. (mid term); consecutive (§ 667.6, subd. (c)) |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs., consecutive |
| 7 – Victoria D. | Forcible oral copulation | 6 yrs. (mid term); consecutive (§ 667.6, subd. (c)) |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs., consecutive |
| 8 – Kathryn B. | Forcible oral copulation | 6 yrs. (mid term); consecutive (principal term; § 1170.1, subd. (a)) |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs.; consecutive |
| 9 – Victoria D. | Forcible oral copulation | 6 yrs. (mid term); concurrent |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs.; concurrent |
| 10 – Kathryn B. | Forcible oral copulation | 6 yrs. (mid term); concurrent |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs.; concurrent |
| 11 – Victoria D. | Forcible oral copulation | 6 yrs. (mid term); concurrent |
| | Use of a gun (§ 12022.3, subd. (a)) | 3 yrs.; concurrent |
| 12 – Kathryn B. | Penetration with a foreign object | 6 yrs. (mid term); consecutive (§ 667.6, subd. (c) |
| | Use of a gun (§ 12022.3, subd. (a)) | Stayed per § 654 |
| 13 – Victoria D. | Penetration with a foreign object | 6 yrs. (mid term); consecutive (§ 667.6, subd. (c) |
| | Use of a gun (§ 12022.3, subd. (a)) | Stayed per § 654 |
| 14 – Residence of Shawn B. | First degree burglary | 1 yr., 4 mos.; (consecutive subordinate term § 1170.1, subd. (b)) |
| | Use of a gun (§ 12022.5) | 8 mos.; consecutive |
| 15 – Shawn B. | Robbery | Stayed per § 654 |
| | Use of a gun (§ 12022.5) | Stayed per § 654 |
| 16 – Shawn B. | Forcible oral copulation | 8 yrs. (upper term); consecutive (§ 667.6, subd. (d)) |
| 17 – Residence of Lisa D. & Joyce M. | First degree burglary | Stayed per § 654 |
| 18 – Lisa D. | Robbery | 1 yr.; consecutive (§ 1170.1, subd. (b)) |
| 19 – Joyce M. | Robbery | 3 yrs. (mid term); concurrent |
| 20 – Lisa D. | Rape | 8 yrs. (upper term); consecutive (§ 667.6, subd. (d)) |

| Count/Victim | Crime/Enhancement | Term |
|---|---|---|
| 21 – Lisa D. | Forcible oral copulation | 6 yrs. (mid term); consecutive (§ 667.6, subd. (c)) |
| 22 – Joyce M. | Forcible oral copulation | 8 yrs. (upper term); consecutive (§ 667.6, subd. (d)) |
| 23 – Joyce M. | Forcible oral copulation | 6 yrs. (mid term); concurrent |
| 24 – Lisa D. | Penetration with a foreign object | 6 yrs. (mid term); concurrent |
| 25 – Joyce M. | Penetration with a foreign object | 6 yrs. (mid term); consecutive (§ 667.6, subd. (c)) |
| 26 – Residence of Karen H. | First degree burglary | 1 yr., 4 mos.; consecutive (§ 1170.1, subd. (a)) |

Total: 106 years, 4 months