Filed 7/16/15  P. v. Diaz CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HAMILTON DIAZ,<br><br>Defendant and Appellant. | A133056<br><br>(San Francisco City and County<br>Super. Ct. No. 205603) |

Appellant Hamilton Diaz was convicted, following a jury trial, of one count of voluntary manslaughter, with personal use of a deadly weapon (an automobile), and one count of failing to stop a vehicle involved in an accident resulting in death.  On appeal, he contends the trial court (1) improperly refused to instruct the jury on involuntary manslaughter, and (2) abused its discretion when it imposed an aggravated sentence on his involuntary manslaughter conviction without recognizing the presence of significant mitigation.  We shall affirm the judgment.

**PROCEDURAL BACKGROUND**

Appellant was charged by amended information with murder (Pen. Code, § 187, subd. (a)—count I),[1] and failing to stop a vehicle involved in an accident resulting in serious injury or death (Veh. Code, § 20001, subd. (a)(1)—count II).  The information alleged, as to count I, personal use of a deadly weapon, to wit:  an automobile, within the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On August 5, 2008, the prosecutor amended the information to strike language from count I stating that the offense was willful, deliberate, and premeditated.

meaning of section 12022, subdivision (b)(1). The information further alleged that appellant had served a prior prison term, pursuant to section 667.5, subdivision (b).

Following a trial, a jury found appellant not guilty of second degree murder, but found him guilty of the lesser included offense of voluntary manslaughter, and found true the personal use of a deadly weapon allegation. It also found him guilty of failing to stop a vehicle involved in an accident resulting in death. Thereafter, the trial court found true the prior prison term allegation.

On August 9, 2011, the trial court sentenced appellant to a total term of 14 years in prison.

On August 17, 2011, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

### Prosecution Case

Russell Kimball testified that he was a friend of the victim, Randall Gross. At the time of Gross's death, they had known each other for about five months, worked together, and lived in the same apartment building on Valencia Street in the Mission District of San Francisco. After work, they usually went to a bar and had a few beers. On the night of March 19, 2007, Kimball came home from work and drank three or four beers in his apartment. About 8:00 p.m., Gross came over with a half pint of Hennessey Cognac, which Gross drank.

Approximately 10:00 p.m., Kimball and Gross went to a bar at 18th and Guerrero Streets called the 500 Club. Kimball drank shots of hard liquor, as well as four or five beers. Gross drank three Rum and Cokes and also drank about four shots. Gross, who was now fairly intoxicated, left the bar after about 45 minutes. The bartender asked him to leave because he was being loud and boisterous, and was annoying people. Kimball stayed at the bar for a while longer, and drank more beer. When he left the bar, he was drunk. Later, after Kimball returned to his apartment, Gross called and said he was so drunk he did not even know where he was. Gross eventually found his way back to their apartment building, where they met up again around 1:30 a.m. They may have had a bit more to drink before heading to a liquor store about 1:45 a.m. to get cigarettes.

2

Kimball testified that, shortly before 2:00 a.m. on March 20, 2007, he and Gross were at the southeast corner of 16th and Valencia Streets. They had just bought cigarettes at a liquor store when they started to cross 16th Street in a crosswalk, heading north on Valencia toward their apartment building. The traffic light showed that they had the right of way but, as they crossed the street, a red Toyota Tercel came south on Valencia and started to turn left onto 16th Street. The car stopped in the middle of the intersection, impeding their ability to cross the street in the crosswalk. The car stopped for two seconds before inching forward as if the driver wanted to go ahead of them.

Gross stood in front of the car, waved his hands, and yelled curse words at the driver, who yelled and waved his hands back at Gross. As they exchanged words, the driver continued to slowly inch the car forward toward Gross, who was standing directly in front of the car. After about four seconds of this, Kimball, who had moved back to the sidewalk, saw the driver drive around Gross "pretty quickly," passing within three feet of him. The driver then pulled over and rapidly and aggressively exited his car. Gross and the driver walked toward each other and engaged in "heated verbal exchange," with their faces inches apart. The driver was a Latino male, in his late 20s to mid-30s; he was stocky and he was five feet, five inches to five feet, ten inches tall. He was speaking in Spanish and had on what looked like a white painter's uniform with a white painter's hat. Gross and the driver yelled and gestured at each other for eight to ten seconds or longer when Kimball walked over and tried to separate them by telling Gross, " 'let's go back. Just let this guy go!' " Kimball never saw Gross actually touch the driver.

Kimball had convinced Gross to walk back to the crosswalk on 16th Street when the driver got into his car and abruptly made a U-turn in the middle of 16th Street into the lane for oncoming traffic. The driver accelerated diagonally across the lane "fairly aggressively" toward Gross, and it appeared to Kimball that he tried to hit Gross with the car. The car came within three or four feet of Gross before the driver braked suddenly. Gross, who had moved out of the way, walked back over to the passenger side of the car and Kimball saw him punch the right front of the car—apparently the windshield—three to four times. Gross then briskly walked across the street, and continued walking north

3

on Valencia. Kimball, who believed this person was trying to run over his friend, had returned to the sidewalk by the liquor store for his own safety.

The car remained stopped in the middle of the intersection for some eight seconds before moving north on Valencia. Gross was about 60 feet away, walking along the sidewalk. Gross saw and heard the car accelerate "hard" and move onto the sidewalk. The car proceeded north on the sidewalk along Valencia Street until Kimball saw it hit the left side of Gross's body. Gross was "violently thrown in the air," hit a building, and came down on the curb side of the sidewalk. The driver had not attempted to stop or brake; Kimball saw no brake lights and the car appeared to be accelerating the entire time as he drove down the sidewalk and hit Gross. The car then proceeded north on Valencia on the sidewalk before eventually returning to the street.

Kimball ran over to Gross, who was lying on the ground, face up. His limbs were twisted and broken, and he looked like he was in agonizing pain. His shoes had been thrown off of his feet. His eyes were open and he was conscious. As Kimball, who was in shock, held his hands and told him to hang on, Gross was opening his mouth, trying to say something, but he regurgitated blood. Police and an ambulance arrived very quickly and Kimball gave the police officers a description of the driver of the red Toyota. An officer took him to 16th and Mission Streets to view someone and he recognized the person as the driver of the car that hit Gross. Kimball had also identified the driver at the preliminary hearing, but at the time of trial—four years later—he did not recognize anyone in the courtroom as the person he had identified.[2]

Geoffrey Gregory testified that, on the night and early morning of March 19 to March 20, 2007, he and a friend went to a number of bars in the Mission District. Gregory consumed about three beers that night. After leaving a bar on 16th Street after 2:00 a.m., he and his friend walked to a bus stop at the northeast corner of Valencia and 16th Streets. While at the bus stop, Gregory saw two pedestrians who seemed drunk

_____

[2] The trial court took judicial notice of a court order, which stated that Kimball had identified appellant as the driver of the car at the preliminary hearing.

4

slowly crossing 16th Street against the red light and also saw a driver in a Maroon Toyota Tercel heading east on 16th street. The driver, a Hispanic male in his late 20's or early 30's, who had tan skin and was wearing a cap, slowed to let the pedestrians cross the street.

One of the pedestrians stopped in front of the car and began yelling obscenities at the driver and raising his hands above his head in a confrontational manner; the yelling lasted for about five seconds. The driver turned and accelerated toward the pedestrians before stopping "pretty close" to them. At that point, the pedestrian who had been yelling at the driver jumped to the passenger side of the car and punched the windshield twice with his fist, making two cracks in it, and yelled at the driver again before continuing north on Valencia with his friend and out of Gregory's sight. Five to ten seconds later, the driver of the car did a quick three-point turn and "shot upward north on Valencia after the pedestrians." The car "was accelerating as fast as it could," and appeared to be driving up the sidewalk. Gregory then heard people scream. He ran around the corner onto Valencia and saw a body in the middle of the sidewalk. He approached the body and saw that it was the man who had punched the car. He was breathing, but dazed, and there was a puddle of "blood solution" next to him. The other pedestrian was standing by his friend and panicking.

A police officer and paramedics soon arrived and the paramedics took the injured man away. Soon thereafter, the police officer took Gregory around the block to see if he recognized someone as the driver of the maroon Toyota. The man he saw had tan skin, but was not wearing a cap. Gregory "sort of" recognized the man, but said he would only be certain if the man was wearing a cap.

Toshiyuki Saizaki testified that, in March 2007, he was living in the Mission District. On March 20, after 2:00 a.m., he was driving his blue minivan south on Valencia Street when he stopped at a traffic light at the intersection of Valencia and 16th Streets. Saizaki saw a small red car stopped at 16th Street and then saw a person yelling

5

at the driver and pounding on the window.[3] He then saw the person who had been hitting the window begin to run down the sidewalk. The red car drove onto the sidewalk, knocking over a newsstand and other obstacles, and chased after the person who was running. The car was moving at a fast speed and "the driver was stepping on the accelerator as much as possible." Saizaki then saw the car hit the victim, whose body hit the car's windshield, rose into the air, hit the wall of the building, and fell to the sidewalk headfirst. The car continued along the sidewalk briefly before going into the street and heading north.

Saizaki made a U-turn and chased the red car, hoping to see the license plate number. The red car made a right turn against traffic onto 15th Street, a one-way street, and Saizaki followed. The red car stopped at a small alley and Saizaki approached to try to see the license plate number. The driver, who was wearing a large white T-shirt and a baseball cap, stared right at him, which frightened Saizaki. Saizaki parked a half-block away and watched the red car to make sure the driver would not flee. A short time later, he drove back to 16th and Valencia, where he told a police officer that he knew where the suspect's car was. Saizaki drove the officer back to where the driver's car was still parked, but the driver was gone. Officers later took Saizaki to Mission Street to view possible suspects, but he could not say if the driver of the red car was one of them. He was, however, certain that the car he saw parked in the alley was the same car that hit the victim.

Paul Donald testified that he was working late at his office at the corner of 15th Street and Caledonia Alley in the Mission District, early on the morning of March 20, 2007. Shortly after 2:00 a.m., he saw a gray minivan speeding eastbound on 15th Street, which was the wrong direction on that one-way street. He then saw a red Toyota that had been parked in Caledonia Alley back up and head westbound down 15th Street. Donald almost immediately heard sirens nearby and saw the same red Toyota pull back into the

---

[3] On cross-examination, Saizaki testified that he did not recall whether the man was punching the windshield or the driver through an open window.

alley. The car was "quite beat up," with a shattered windshield on the passenger side. A man with a medium complexion and short dark hair got out of the car. He appeared to be Hispanic, and was wearing a white T-shirt. He looked in both directions and walked away toward Mission Street.

A short time later, at least six police cruisers showed up, along with the gray minivan. Donald told the officers what he had seen, and learned that there had been a hit and run in the neighborhood. Later, the police took Donald to Mission Street near 16th Street to view a possible suspect. He told the officers he could not be absolutely certain, but the suspect's shirt and general build matched the person he saw get out of the red car. The shirt was white with a pattern or graphic on the front.

Kevin Labanowski and Sidney Sakurai, inspectors with the San Francisco Police Department, testified that, approximately 2:00 a.m. on March 20, 2007, they were traveling northbound on Mission Street when they heard a description over their radio of a Latino suspect, wearing a white hat and all white clothing that looked like painter's clothing. They had just passed a person who fit that description crossing 15th Street; Labanowski therefore made a U-turn, and again saw the man on Mission near 16th Street. They detained appellant, who was no longer wearing the white shirt and white cap he was wearing when the officers had first seen him. Appellant smelled of alcohol, though he was not staggering. He had no visible injuries. Labanowski checked appellant's pockets and found two car keys and some other keys. One of the car keys unlocked the door and the other started the ignition of the Toyota Tercel.

Inspector Sakurai retraced appellant's path and, inside a garbage can on Mission between 15th and 16th Streets, he found a white T-shirt and white hat that were consistent with what appellant was wearing when Sakurai first saw him. The hat had the word "Moore" printed on it. He put the two items of clothing on the ground next to the garbage can and another officer came and secured the scene.

Carolos Antonio Ramos testified that, in 2007, he was working at Katz Bagels on 16th Street between Valencia and Guerrero. Appellant worked part-time at the bagel shop. Ramos recalled seeing appellant the night before police officers came to interview

7

him.  Appellant had walked into the shop between midnight and 1:00 a.m.; he was dressed in white and sounded like he had been drinking.  Appellant was at the shop for 15 to 25 minutes.  When he left, he took some bagels with him.

San Francisco Police Inspector Anthony Gomes testified that, approximately 3:40 a.m. on the morning of March 20, 2007, he arrived at 16th and Valencia Streets to investigate the crime scene.  Gomes also went to a second scene 15th and Caledonia Streets where a vehicle had been found that was thought to be related to the first scene.  The vehicle, a 1992 two-door Toyota Tercel, was unattended and was stopped facing north into Caledonia Alley.  The car's gearshift was in the reverse position and the hand brake was engaged; there was no key in the ignition.  The front windshield was shattered from the outside and there appeared to be two strikes to the windshield on the passenger side.  The right side door was dented inward and the window in the passenger door was completely shattered.  Both external side mirrors were missing.  There was a great deal of glass in the car.  In Gomes's opinion, it would have been difficult to crack the windshield with a fist.

Gomes then returned to the scene at 16th and Valencia Streets, where he found various pieces of evidence, including, inter alia, parts of the side view mirror, glass fragments, and a shoe on the sidewalk.  A matching shoe was in the street nearby.  He also noted several obstacles along the sidewalk, including a newspaper dispenser, steel electrical junction box, a traffic light pole, two street lamps, a trash container, a tree surrounded by a tree guard, a bike rack, and a fire hydrant.  The sidewalk was approximately 12 feet wide, though, with the obstacles, it was under six feet wide at its narrowest point.

At 6:00 a.m., Gomes went to a third scene on the east sidewalk on Mission Street between 15th and 16th Streets.  On the sidewalk, next to a trash can, there was a white shirt with a painter's cap rolled up inside of it.  Printed on the front of the cap was "Kelly-Moore Paints" and on the back was "The Painter's Paint Store."  The white T-shirt had writing on the front and back that said, "Ryan & Ryan Construction, Inc., General Contractors," with a telephone number.

8

San Francisco Police Inspector Pauline Hnatow testified that, on March 21, 2007, she processed the Toyota Tercel, which included collecting DNA samples from the steering wheel. Inside the car, she found broken glass, as well as fibers that were trapped in the seal of the broken front passenger window and at the base of the front passenger door, on the inside.[4] There were two paper bags of bagels in the back of the car. The damage to the car, including a circular pattern on the front passenger-side windshield and a slight dent in the hood, was consistent with it having collided with a pedestrian. The extensive damage to the windshield was indicative of a body hitting it, not a fist.

Dr. Ellen Moffatt, an assistant San Francisco medical examiner and expert in the area of forensic pathology, testified that, on March 21, 2007, she performed an autopsy on the victim, Randall Gross. Gross was five feet, ten inches tall and weighed 180 pounds. He had some scrapes, lacerations, and abrasions on his scalp, forehead, and face. Abrasions and lacerations on the right side of his face were consistent with his face hitting an object. There were scrapes and bruises on his chest, abdomen, right arm and hand, and legs, including a tear in his left lower leg through which the bone could be seen.

Gross also suffered internal injuries, including hemorrhaging in the soft membrane covering his brain, the left side of his brain, and his left back and neck muscle. He had blood in both the right and left chest cavities, and he had multiple rib fractures. His spinal column was broken and the spinal cord was bruised. The lower portion of his spine was pulled away from the muscles and his sacrum was partially pulled off of the pelvic bone. His sternum was also fractured. He had lacerations on his liver and hemorrhaging in his left kidney. He also had multiple fractures in his left leg that were consistent with being hit by a car, since the bumper is generally the first thing to hit the body.

---

[4] A criminalist subsequently testified that he had compared fiber evidence from the car with Gross's clothing and determined that some of the fibers from the car were physically and chemically similar to the material from Gross's boxer shorts.

Gross had bruising on the knuckles of his right hand, but only a small scrape or cut on the third finger of his right hand. Dr. Moffatt would expect to see more cuts on Gross's hand if he had punched a windshield and broken it.

The toxicology report showed that Gross had 0.27 percent alcohol in his blood and 0.31 percent alcohol in his vitreous humor, which is the fluid in the eye. He also had 0.1 milligrams per liter of cocaine and 0.2 milligrams per liter of benzoylecgonine, a metabolite of cocaine, in his body.

Dr. Moffatt determined that the cause of Gross's death was multiple blunt force injuries and that the manner of death was homicide.

## Defense Case

Dr. Nikolas Lemos, forensic laboratory director and chief forensic toxicologist at the San Francisco Office of the Chief Medical Examiner, testified as an expert in the area of toxicology. Dr. Lemos testified that the report summarizing the toxicology findings relating to Randall Gross reflected that his alcohol level was more than three times the legal limit for driving. The cocaine in Gross's urine suggested that he had been exposed to the drug within a few hours of his death. Dr. Lemos opined that Gross was under the influence of both alcohol and cocaine at the time of the incident that resulted in his death.

Cocaine increases the threshold for pain and makes a person more likely to overreact and lose control without recognizing the consequences of the overreaction. It can increase aggression and cause people to think they are "superhuman." In addition, a blood alcohol level of 0.27 percent could cause confusion and aggression. Dr. Lemos opined that "[t]he cocaine and alcohol interaction is one of multiplication."

## DISCUSSION

### I. *Trial Court's Refusal to Instruct on Involuntary Manslaughter*

Appellant contends the trial court erred when it refused to instruct the jury on involuntary manslaughter as a lesser included offense of murder.

### A. *Trial Court Background*

At the conclusion of the evidence portion of the trial, defense counsel asked the trial court to instruct the jury on the lesser included offense of involuntary manslaughter.

10

Counsel argued that there was substantial evidence that appellant "suddenly snapped and without consciously forming an intent to kill or consciously disregarding the safety of humans just put his foot on the gas pedal in that few seconds span that passed, hitting Mr. Gross, that they then could find him guilty of involuntary manslaughter because then you have a situation where there was a killing that was committed in the heat of passion without either an intent to kill or without conscious disregard for life."

The court asked counsel what the evidence was of either "an instinctive reaction or a sudden snap," since it seemed to the court that, "on this record you are asking the jury to guess or speculate as to whether or not that happened." Counsel responded that he believed there was sufficient evidence from which the jury could reasonably draw the inference that appellant had snapped, based on the timing, the conduct, and the provocation that preceded appellant hitting Gross with his car. The court analogized the way appellant used his car to the use of a firearm, stating, "because of the aiming and the accelerating, basically there's really no place to go when you're on the sidewalk. It's practically the equivalent of coming up behind a guy that has his back towards you and aiming a rifle from a few feet away . . . ." The court denied the request for an involuntary manslaughter instruction because of the lack of substantial evidence to support such a theory.

The trial court instructed the jury on second degree murder and voluntary manslaughter, based on sudden quarrel or heat of passion. The jury ultimately found appellant not guilty of second degree murder, but found him guilty of voluntary manslaughter, with the personal use of a deadly weapon.

### B. *Legal Analysis*

The trial court is required to instruct on all theories of a lesser included offense that find substantial evidentiary support, but " 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense . . . . [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 553

11

(*Moye*); accord, *People v. Breverman* (1998) 19 Cal.4th 142, 162.)  "We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant [citations]."  (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

"Murder is defined as 'the unlawful killing of a human being, or a fetus, with malice aforethought.'  ([§ 187, subd. (a)].)  Malice aforethought 'may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'  (§ 188.) . . .  [Citations.]  '[Our Supreme Court has] interpreted implied malice as having "both a physical and a mental component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.'  [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'  [Citation.]"  [Citation.]'  [Citations.]"  (*People v. Bryant* (2013) 56 Cal.4th 959, 964-965 (*Bryant*).)

Both voluntary and involuntary manslaughter are lesser included offenses of murder.  (*People v. Avila* (2009) 46 Cal.4th 680, 705.)  "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter.  [Citations.]  We have often described both provocation and unreasonable self-defense as 'negating' the malice required for murder or as causing that malice to be 'disregarded.'  [Citations.]"  (*Bryant*, *supra*, 56 Cal.4th at p. 968.)  "Involuntary manslaughter, in contrast, is the unlawful killing of a human being without malice.  (§ 192.)  It is statutorily defined as a killing occurring during the commission of 'an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection.'  (§ 192, subd. (b).)  Although the statutory language appears to exclude killings committed in the course of a felony, the

12

Supreme Court has interpreted section 192 broadly to encompass an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection. [Citations.]" (*Brothers*, *supra*, 236 Cal.App.4th at p. 31.)

Recently, in *Bryant*, *supra*, 56 Cal.4th at page 970, our Supreme Court held that a killing committed without malice in the commission of an inherently dangerous assaultive felony cannot be voluntary manslaughter "because voluntary manslaughter requires either an intent to kill or a conscious disregard for life." The court disapproved of *People v. Garcia* (2008) 162 Cal.App.4th 18, 31 (*Garcia*), in which the appellate court held that an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter. (See *Bryant*, at p. 970.) Although the *Bryant* court expressly did not reach the issue of whether a killing committed without malice in the commission of an inherently dangerous assaultive felony constituted involuntary manslaughter (see *id.* at pp. 970-971), the Second District Court of Appeal recently concluded that, "if an unlawful killing in the course of an inherently dangerous assaultive felony without malice must be manslaughter [citation] and the offense is not voluntary manslaughter [citation], the necessary implication of the majority's decision in *Bryant* is that the offense is involuntary manslaughter. Accordingly, an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous felony." (*Brothers*, *supra*, 236 Cal.App.4th at pp. 33-34.)

Appellant argues that, in this case, the trial court's decision not to give an involuntary manslaughter instruction was improperly based on *Garcia*, which, as discussed, the Supreme Court subsequently overruled in *Bryant*. Respondent counters that the court's purportedly improper reliance on *Garcia* is irrelevant because it could not have properly instructed the jury with involuntary manslaughter in any case. As respondent observes, subdivision (b) of section 192—the provision defining involuntary manslaughter—specifically states that "[t]his subdivision shall not apply to acts committed in the driving of a vehicle." Therefore, according to respondent, "involuntary

13

manslaughter is not an available lesser included offense under the circumstances of this case where the homicide was committed using a vehicle as the instrument." Appellant vigorously contests respondent's interpretation of section 192. We need not, however, resolve this particular dispute because we find that, regardless of whether involuntary manslaughter was legally foreclosed in this case due to appellant's use of a vehicle, the trial court properly refused to instruct on involuntary manslaughter for another reason: because such an instruction was simply not supported by the evidence. (See *Moye*, *supra*, 47 Cal.4th at p. 553.)[5]

This case is factually similar to *Brothers*, in which the appellate court rejected the defendant's argument that, in light of *Bryant*, the trial court should have instructed on involuntary manslaughter as a lesser included offense of murder. As the *Brothers* court explained: "[W]hen, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural [and probable] consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter. [Citations.] Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence. We do not believe that is what the Supreme Court intended in *Bryant*." (*Brothers*, *supra*, 236 Cal.App.4th at p. 35.)

In this case, several eyewitnesses testified that, following a heated altercation with appellant, Gross walked away, heading north along the sidewalk on Valencia Street. The evidence shows that appellant paused for five to ten seconds before giving chase in his car, "stepping on the accelerator as much as possible" as he drove onto and maneuvered

---

[5] This conclusion is not undermined by the trial court's reliance on the now-overruled decision in *Garcia*, *supra*, 162 Cal.App.4th at page 31, in refusing to instruct on involuntary manslaughter, given that "we review the trial court's ruling and not its reasoning." (*People v. Mason* (1991) 52 Cal.3d 909, 944; accord, *People v. Singh* (1995) 37 Cal.App.4th 1343, 1381.)

14

along the narrow sidewalk for some 60 feet, finally hitting Gross from behind and throwing him violently into the air. He then drove away without so much as slowing down. This evidence fully supports the jury's finding that Gross's provocation obscured appellant's reason and negated malice, the very definition of heat of passion voluntary manslaughter. (See *Bryant*, *supra*, 56 Cal.4th at p. 968.) The evidence does not, however, support appellant's claim that "the jury could have found that appellant drove down the sidewalk without either the intent to kill or the conscious disregard of the risk to Gross's life," but instead that "appellant was beyond being provoked into action, but rather had 'snapped,' acting without regard for the risk he was creating." As in *Brothers*, no evidence whatsoever supported this theory that, when he struck and killed Gross, appellant was in some indeterminate altered state in which he could not "subjectively appreciate[] the danger to human life his conduct posed[.]" (See *Brothers*, *supra*, 236 Cal.App.4th at p. 35.)

In sum, considering the evidence in the light most favorable to appellant, there was no substantial evidence of lack of malice from which a reasonable jury could have concluded that appellant was guilty of involuntary manslaughter. (See *Moye*, *supra*, 47 Cal.4th at p. 553; *Brothers*, *supra*, 236 Cal.App.4th at pp. 30, 33-35.) Hence, the court did not err when it refused to give a voluntary manslaughter instruction. (*Ibid*.)

## II. *Imposition of an Aggravated Sentence*

Appellant contends the trial court abused its discretion when it imposed an aggravated sentence on his voluntary manslaughter conviction without recognizing the presence of significant mitigation.

### A. *Trial Court Background*

The presentence report listed six circumstances in aggravation: (1) appellant was armed with or used a weapon at the time of the commission of the crime (Cal. Rules of Court, rule 4.421(a)(2));[6] (2) he engaged in violent conduct that indicated a serious danger to society (rule 4.421.(b)(1)); (3) he had served a prior prison term (rule

---

[6] All further rule references are to the California Rules of Court.

15

4.421(b)(3)); (4) he was on parole and/or probation when the crime was committed (rule 4.421(b)(4)); (5) his prior performance on probation and/or parole was unsatisfactory (rule 4.421(b)(5)); and (6) the crime involved great violence, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)).

The presentence report also stated that appellant had been previously convicted of causing a fire in an inhabited structure (§ 452, subd. (b)) in 2005, and had been sentenced to two years in state prison in 2006.

Before the sentencing hearing, defense counsel and the prosecutor filed sentencing memoranda, in which they discussed possible circumstances in aggravation and mitigation.

At the August 9, 2011 sentencing hearing, the prosecutor requested that the trial court sentence appellant to 14 years in prison, including the upper term of 11 years for the voluntary manslaughter conviction. The prosecutor suggested that there were two aggravating factors, including appellant being on parole when this offense was committed and "the crimes being committed escalated in violence such that he is a danger to society." The prosecutor argued that a potential mitigating factor—that appellant was provoked and was not the first aggressor—had already reduced the murder to manslaughter, and that it would be unfair to count that as a mitigating factor also.

Defense counsel requested an eight-year sentence, which would include the six-year middle term for the voluntary manslaughter conviction, one-year terms for the two enhancements, and a concurrent one-year middle term for count II. Regarding the six circumstances in aggravation listed in the presentence report, counsel argued that the circumstances of being armed with a weapon and having served a prior prison term would have to be removed if the court imposed the related enhancements. Counsel further argued that the two circumstances related to parole—that appellant was on parole when the crimes were committed and his prior parole performance was unsatisfactory— were intertwined in that the poor performance on parole was based on his being on parole when he committed these offenses.

16

Counsel also disputed that appellant engaged in violent conduct that indicated a *serious* danger to society in that "the word 'serious' obviously means a higher risk than normal" but, in the presentence report, the probation officer concluded that appellant's risk of recidivism was only "medium." Finally, counsel argued that the offense did not involve great violence disclosing a high degree of cruelty, but instead was "a provoked explosion of violence, uncontrollable explosion of violence, that happened in an instan[t], not the kind of violence that extends over time, that involves repetition," which counsel believed was required by the circumstance in aggravation describing "great violence." (See rule 4.421(a)(1)).

Regarding circumstances in mitigation, counsel argued that appellant had only a single criminal conviction, for recklessly setting fire to an inhabited building, he was employed as a painter, and had a young child. Counsel did not believe the sole remaining circumstance in aggravation (appellant was on parole at the time of the offense) outweighed the circumstances in mitigation, and therefore asked for the middle term on the voluntary manslaughter count.

Following these arguments, the trial court imposed the upper term of 11 years on the voluntary manslaughter conviction, a consecutive one-year term (one-third the midterm) on conviction for failing to stop a vehicle involved in an accident resulting in serious injury or death, a consecutive one-year term for the deadly weapon enhancement, and a consecutive one-year term for the prior prison term enhancement, for a total sentence of 14 years in prison. The court explained the basis for this sentence as follows:

"The court exercises its sentencing discretion under Rule 4.420 of the sentencing rule[s] of the court. [¶] The court does evaluate the factors and circumstances in aggravation. The court does find the following circumstances in aggravation to exist . . . and the court will only use, let's put it that way, those circumstances in aggravation that can properly be evaluated by the court concerning a sentence.

"The court does find that the defendant . . . did use a weapon at the time of . . . commission of the crime. The court finds that defendant has engaged in violent conduct that indicates a serious danger to society. The court finds that defendant has served a

17

prior prison term. I'm reading from the probation report. [The defendant] was on parole when the crime was committed. [¶] I think you are right about factor number five regarding his performance on probation, Mr. Goldrosen [defense counsel]. The court also finds that the crime involved great violence, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness.

"Furthermore, turning to the circumstances in mitigation, the court does find that the victim was an initiator of and did engage in conduct that did provoke the incident. And the crime was committed because of—I don't believe though—well, the crime, this type of crime under these circumstances, is generally committed because of an unusual circumstance such as provocation, which such as—[*sic*] however, Court of Appeals says in this case the defendant is likely to be provoked again.

"In evaluating what the court sees to be the important sentencing factors, the court does find [a] further factor in aggravation. The court finds under rule 4.421(A)(3) that Mr. Gross was a victim that was particularly vulnerable. [¶] This situation occurred when the altercation in the street was basically over and he walked away on the sidewalk with his back turned to the defendant. The defendant's running up and behind him full throttle with the car almost can be considered an ambush. There was no opportunity for him to defend himself or get out of the way because he was attacked from behind. There was no [time for] escape from that sidewalk. . . . One side of the sidewalk was a wall of buildings and there were other things such as cars and trees and other objects on the other side.

"Under these circumstances and given the nature of the altercation that occurred in the street, the court finds that this particular act goes beyond merely great violence or great bodily harm, which I am not using as factors, but the act discloses a high degree of cruelty, viciousness and callousness way beyond knocking someone down with a car intentionally.

"The court finds that this indicates that the defendant is a serious danger to society, and, furthermore, as far as the previous offense that he was convicted of, that was an arson apparently in order to get revenge on a member of his family. I believe that . . .

18

there is a strong likelihood of a recurrence of provoking factors in his life that will lead to further instances of rage, use of violence, and cruelty on the part of the defendant.

"And so in trying to balance the circumstances in mitigation with those in aggravation and of a proper exercise of judgment, a proper weighing under rule 4.420, the court will impose the aggravated term. . . ."

## B. *Legal Analysis*

Under section 1170, subdivision (b), "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to Section 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing. The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (Accord, rule 4.420; see also § 1170, subd. (c).) The trial court's sentencing decision is reviewed for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

Appellant first argues that two of the circumstances the trial court found in aggravation—that appellant used a weapon in the commission of the crime and that he had a prior prison term (rule 4.421(a)(2) & (b)(3))—could not be used as aggravating factors because they were the same facts that were used to enhance his sentence pursuant to section 12022, subdivision (b)(1), and section 667.5, subdivision (b). (See § 1170, subd. (b); accord, rule 4.420(c).) Respondent does not agree that the court found that these were circumstances in aggravation, and maintains that the court was merely reading from the presentence report at the time it mentioned these two circumstances, after stating that it would only consider those circumstances in aggravation that it properly could use in choosing a sentence.

19

Although it is not completely clear from the record whether the court intended to find these two facts to be aggravating circumstances, to the extent it did, we agree with appellant that they could not properly be used to aggravate appellant's sentence. (See § 1170, subd. (b); rule 4.420(c).) Elimination of these two circumstances does not, however, necessarily require reversal of the sentence since a ''single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term. [Citation.]'' (*People v. Black* (2007) 41 Cal.4th 799, 813 (*Black*).)

The court found four additional circumstances in aggravation. First, it found that appellant had been on parole at the time of the offense, which appellant does not contest.[7] (See rule 4.421(b)(4).) The court then found that the victim was particularly vulnerable. (See rule 4.421(a)(3).) Appellant argues that the court improperly found victim vulnerability since, "in any collision between a pedestrian and an automobile, . . . the pedestrian will be particularly vulnerable in light of the physics involved in such a collision." The court, however, observed that Gross was walking away on the sidewalk with his back to appellant when appellant came racing up "behind him full throttle with the car," which could almost "be considered to be an ambush. There was no opportunity for him to defend himself or get out of the way because he was attacked from behind." We believe the court could reasonably conclude that Gross was particularly vulnerable in light of the specific facts of this case, beyond the vulnerability experienced by any victim of a pedestrian-automobile collision. (See *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1321, disapproved on another ground in *People v. Cook* (2015) 60 Cal.4th 922, 939 [" ' "[p]articular vulnerability" is determined in light of "total milieu in which the commission of the crime occurred" ' "]; see also *People v. Huber* (1986) 181 Cal.App.3d 601, 629 [" 'Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act' "].)

---

[7] The trial court agreed with defense counsel that it could not also use appellant's poor performance on probation as a circumstance in aggravation. (See rule 4.421(b)(5).)

The court also found "that this particular act goes beyond merely great violence or great bodily harm, which I am not using as factors, but the act discloses a high degree of cruelty, viciousness and callousness way beyond knocking someone down with a car intentionally." (See rule 4.421(a)(1).) Appellant argues that use of this circumstance in aggravation violates rule 4.420(d), which prohibits use of "[a] fact that is an element of the crime upon which punishment is being imposed" to impose a greater term. According to appellant, "[t]here are no facts about this voluntary manslaughter, with the car being used as a weapon, that are more egregious than any other homicide committed in that fashion." We disagree. The court reasonably found that appellant's conduct exceeded the acts that would be necessary to commit the crime in given that, after the altercation ended, appellant came racing up behind Gross on the sidewalk, hitting him so violently that he flew out of his shoes before hitting a nearby building and bouncing back onto the sidewalk.

The court further found that the extremely violent nature of the present crime indicated that appellant was "a serious danger to society, and, furthermore, as far as the previous offense that he was convicted of, that was an arson apparently in order to get revenge on a member of his family. I believe that . . . there is a strong likelihood of a recurrence of provoking factors in his life that will lead to further instances of rage, use of violence, and cruelty on the part of the defendant." (See rule 4.421(b)(1).) As to this circumstance in aggravation, appellant argues that the court again engaged in dual use of factors in that it relied on facts pertaining to the voluntary manslaughter conviction and on appellant's prior conviction, which was used to enhance his sentence. As we have explained, with respect to other circumstances in aggravation found by the court, the violence involved in this offense made it " 'distinctively worse than the ordinary.' " (*Black*, *supra*, 41 Cal.4th at p. 817.) Moreover, as to appellant's prior conviction, the court plainly was not relying on the fact that appellant had a prior felony conviction but, instead, was focusing on the facts of that crime, which involved vengeance against a family member. The court properly relied on this circumstance in aggravation.

With respect to circumstances in mitigation, the trial court found one applicable circumstance: "that the victim was an initiator of and did engage in conduct that did provoke the incident." (See rule 4.423(a)(2) ["The victim was an initiator of, willing participant in, or aggressor or provoker of the incident"].) The court then observed that, normally, such provocation is an unusual circumstance that makes it unlikely that the defendant would be provoked again (see rule 4.423(a)(3)), but found that, in light of the circumstances of both this case and appellant's prior offense for setting fire to an inhabited building "to get revenge on a member of his family," appellant was "likely to be provoked again." Thus, the court found only a single circumstance in mitigation. (Rule 4.423(a)(2).)

Regarding other possible circumstances in mitigation, appellant argues that the court's "[r]efusal to consider the personal characteristics of the defendant in imposing sentence raises serious constitutional questions." In particular, appellant asserts that "the trial court's pronouncement suggests that it did not consider appellant's relatively minor criminal record." (See rule 4.423(b)(1).)

We do not agree that the record reflects a failure on the part of the trial court to consider appellant's personal characteristics, including his criminal record. At the start of the sentencing hearing, the court stated that it had read and considered the probation report and the sentencing memoranda of counsel. It also listened to defense counsel's argument about circumstances in mitigation, including that appellant had previously been convicted of only one crime, that he was employed as a painter before the current incident, and that he had a child. Finally, the court did address appellant's single prior conviction, but did not find it to be "relatively minor," as appellant argues it was. Instead, the court found that the prior crime, together with the current offense, demonstrated that appellant was a danger to society. It is also notable that appellant was convicted of the earlier crime in August 2006, a mere seven months before he committed the present offense. (See rule 4.423(b)(1) ["The defendant has no prior record, or has an insignificant record of criminal conduct, *considering the recency* and frequency *of prior crimes*"], italics added.)

22

Accordingly, there is simply no evidence in the record that the court failed to consider all relevant criteria, including appellant's personal characteristics.  (See rule 4.409 ["Relevant criteria enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise"]; accord, *People v. Weaver*, *supra*, 149 Cal.App.4th at p. 1313 ["Unless the record affirmatively shows otherwise, a trial court is deemed to have considered all relevant criteria in deciding whether to grant or deny probation or in making any other discretionary sentencing choice"].)

In conclusion, because the trial court reasonably found four valid circumstances in aggravation and only a single circumstance in mitigation, its decision to sentence appellant to the upper term for the voluntary manslaughter conviction was not an abuse of discretion.  (See *Black*, *supra*, 41 Cal.4th at p. 813; see also *People v. Sandoval*, *supra*, 41 Cal.4th at p. 847.)

## DISPOSITION

The judgment is affirmed.

_____
Kline, P. J.

We concur:


_____
Richman, J.


_____
Miller, J.


*People v. Diaz* (A133056)

24