Filed 6/9/16  P. v. Griffith CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TERRENCE LARUE GRIFFITH,<br><br>        Defendant and Appellant. | A143583, A144727<br><br>(Contra Costa County<br>Super. Ct. No. 51314517) |

A jury found defendant Terrence Larue Griffith guilty of five felony counts of committing oral copulation or sexual penetration upon a child who was ten years of age or younger (Pen. Code, § 288.7, subd. (b)[1]); five felony counts of forcibly committing a lewd or lascivious act upon a child under the age of 14 (§ 288, subd. (b)(1)); and one misdemeanor count of molesting a child under the age of 18 (§ 647.6, subd. (a)(1)).  The trial court sentenced defendant to state prison for an aggregate term of 100 years to life, and thereafter, made an order directing defendant to pay noneconomic restitution of $300,000 to the victim.

With these consolidated appeals from the judgment of conviction and the restitution order, defendant makes ten arguments:  (1) the trial court abused its discretion in denying his motion to exclude evidence allegedly elicited in violation of *Miranda v. Arizona* (1966) 384 U.S. 436; (2) the trial court abused its discretion in admitting expert testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS); (3) the trial

---

[1] Statutory references are to this code unless otherwise indicated.

1

court erred in instructing the jury with CALCRIM No. 1193; (4) his convictions "must be reversed as a cumulative denial of due process"; (5) one oral copulation conviction is not supported by substantial evidence; (6) the trial court abused its discretion in removing a juror after deliberations had commenced; (7) the prison sentence amounts to cruel and unusual punishment; (8) the restitution order must be set aside; (9) the trial court imposed unauthorized fines; and (10) the abstract of judgment must be corrected. The Attorney General concedes that defendant's last two arguments are well taken. We conclude that none of defendant's other contentions has merit. Accordingly, we modify the judgment, affirm it as modified, and also affirm the restitution order.

## THE EVIDENCE

The parties' briefs demonstrate their familiarity with the record, and defendant does not challenge the sufficiency of the evidence supporting ten of his 11 convictions. The evidence related to that sole count will be discussed at a later point, as will evidence relevant to resolving certain other of defendant's contentions. The following shortened narrative will suffice:

The victim at the time of trial in 2014 was eight years old. As of June 2012, the victim's mother was married to defendant and living with him and the victim. On Christmas Eve of that year, when the mother came to pick up the victim after work, her mother, the victim's grandmother, told her what the victim said, "what Terrence had done to her" months before. The mother notified police, and defendant was promptly arrested while he was in his bed. When told by Officer Vallerga that he was being arrested for "child molestation," defendant calmly inquired: "who told you?"

The victim was interviewed on two occasions at the Children's Interview Center. Both interviews were recorded on videotape. Both videotapes were received in evidence and shown to the jury.

Dr. James Carpenter was the final witness for the prosecution's case-in-chief. He presented expert testimony on CSAAS. That testimony will be discussed in more detail later.

2

Defendant testified that he never molested the victim, or committed any of the acts charged. Defendant presented a number of character witnesses (all of whom were relatives) who testified to his reputation for honesty and appropriate behavior with children.

The defense argued to the jury that the victim's testimony was uncorroborated and amounted to "present[ing] fabricated testimony." Dr. Carpenter's testimony was dismissed this way: as "just filler. That's just an opportunity for the prosecutor to put up a doctor with a really good resume and talk about something that we in the community already know. That's something that was devised 30 years ago when awareness about child molestation was at a different place. The idea that kids immediately have to disclose right away, I think that's intuitive and the common knowledge in our community now. So, then, why was he called to the witness stand." Defendant was in the position where "it's . . . almost impossible to prove a negative," and the jury should not "let the prosecutor use emotion as a substitute for evidence," but should instead credit defendant's numerous character witnesses.

## REVIEW

### The *Miranda* Ruling

Defendant made an oral motion to prevent Officer Vallerga from testifying about defendant's "who told you?" response to being told that he was about to be arrested. The court held a brief hearing conducted pursuant to Evidence Code section 402, at which Vallerga testified as follows:

Late on the evening of December 24, 2012, he and two other officers went to an address, where "the victim's mother let us into the apartment." "We contacted the suspect lying in a bed in the only bedroom inside the apartment, and we took him into custody." Defendant "had . . . some covers pulled up to his neck, chin level." Defendant asked "what we were doing there," to which Officer Vallerga responded: "I told him he was being arrested for molesting a child." "He [defendant] asked me who had told. [¶] . . . I told him it did not matter." Defendant's voice was calm, and "[h]e didn't seem surprised."

3

Following brief argument by the defense, the court ruled there could be no testimony from Officer Vallerga as to defendant being asked whether he denied the charges of child molestation. "[A]s to the *Miranda* issue, clearly . . . it was custodial, but I didn't hear any form of interrogation. So as to that ground, it's denied." Defendant contends the trial court was in error when it concluded that he was not subjected to interrogation.[2]

We have held that " 'In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from the undisputed facts and facts found by the trial court whether the challenged statement was legally obtained.' " (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1211.) Because the salient historical details recounted by Officer Vallerga have never been disputed, the issue of whether defendant was interrogated when he was told he was under arrest is one of law, for our independent review. (*People v. Thomas* (2011) 51 Cal.4th 449, 476; *People v. Mayfield* (1997) 14 Cal.4th 668, 733, [whether statements were made in response to "interrogation"].)

"A defendant who is in custody, as here, must be given *Miranda* warnings before police officers may interrogate him. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 297 . . . .) In *Innis,* the high court defined the term 'interrogation,' stating that 'the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda*

---

[2] Defendant does not renew his argument that the evidence should also have been excluded pursuant to Evidence Code section 352 (section 352).

4

safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.' " *(People v. Haley* (2004) 34 Cal.4th 283, 300.)

Here, there was nothing like an express question directed at defendant. There was not even the functional equivalent of interrogation, because the declaratory statement of the cause for defendant's arrest was not an utterance to which an incriminating response from defendant was invited. (*Rhode Island v. Innis*, *supra*, 446 U.S. 291, 301–302; *People v. Dement* (2011) 53 Cal.4th 1, 26.) No less fundamentally, stating the basis for the arrest is unquestionably among "those normally attendant to arrest and custody" and thus excluded by *Innis* from the definition of interrogation. And the declaratory statement was itself in response to a question from defendant. (See *People v. Thornton* (2007) 41 Cal.4th 391, 432 ["Interrogation thus refers to questioning initiated by the police or its functional equivalent, not voluntary conversation."].) Our independent review of the undisputed circumstances leads to us to complete agreement with the trial court's "I didn't hear any form of interrogation."

## The CSAAS Testimony

Dr. Carpenter was the final witness for the prosecution's case-in-chief. Before he was allowed to testify before the jury, Dr. Carpenter testified at a hearing conducted pursuant to Evidence Code section 402. Over objection by the defense that such testimony was unnecessary and thus in effect irrelevant, the court accepted Dr. Carpenter

5

as an expert on "non-acute exams," that is physical examinations that are conducted more than five days after the suspected abuse occurred.[3]

Before the jury, Dr. Carpenter testified that he conducted a non-acute examination of the victim, with her grandmother present, on January 2, 2013 at the Children's Interview Center. After asking a number of questions, Dr. Carpenter conducted "a complete physical examination." Dr. Carpenter then told the jury that he had testified "as an expert in regards to the Child Sexual Abuse Accommodation Syndrome." At this point, there being no objection by the defense, Dr. Carpenter was also accepted as an expert on this subject.

Dr. Carpenter testified about CSAAS. One feature of the syndrome was that child abuse victims made a secret of what they had suffered. Another feature is that "when a child is holding onto a secret they often are feeling" helpless and entrapped. As a result of these feelings, the victims "accommodate. They basically come to terms . . . with it. . . . [S]ome people come to terms by being in denial about it, not thinking about it." The final stage is revelation, "but it's often delayed, conflicted, partial," and "some . . . will . . . retract it [the revelation]." "[S]ometimes they make these statements and all kinds of things change in their lives or they have different pressures on them. And it's not unusual for a child after having brought it out to take it back."

---

[3] Defense counsel's objection was "Judge, I —obviously for this model the prosecutor has to present common myths that the CSAAS is being used to overcome. I don't think there are any myths in this present day that apply. . . . [¶] [I]n the past 30 years when we hear so many new stories about child molest occurring from family members and the Catholic church scandal, I think that this idea . . . is outdated. I don't think it's something that the prosecutor . . . faces any more." "I . . . would maintain that there's a greater public understanding that not everyone is going to immediately disclose this type of abuse. . . . I don't think that there's a myth that the prosecutor has to overcome." The court's ruling was: "As far as Dr. Carpenter's testimony is concerned, it does go to the weight rather than the admissibility. It does clarify I think for jurors how some children can react, maybe not necessarily all of them. But they don't necessarily have the experience with seeing people testify the way we do, seeing the cases that we see. And I think this might help clarify some of those issues for them."

According to Dr. Carpenter, when interviewed "the majority of . . . children are not dramatically emotionally distraught by the time I see them. But they can be and often during an interview certain things will occasionally bring a child to tears. But on the other hand, some of the younger witnesses are more matter of fact." With respect to questions about "anal contacts . . . the child has more shame or reluctance to bring that part up."

Defendant contends the decision to allow Dr. Carpenter to testify was an abuse of discretion, to allow expert opinion evidence that was "irrelevant and highly prejudicial" and thus deprived him of due process and a fair trial. Specifically, defendant argues that Dr. Carpenter's testimony was "irrelevant, because the 'myths' [primarily supposed delay in reporting abuse to an adult] it was designed to dispel were immaterial to this case." Indeed, "it has simply become routine to admit CSAAS testimony in child molestation prosecutions without assessment of need or relevance." Even if the relevance of the testimony is conceded, it still should have been excluded under section 352 because it "had great potential to mislead and inflame the passions of [the] jury." Moreover, the prosecutor in his final closing argument improperly used Dr. Carpenter's testimony to establish the fact of the victim's molestation. We do not agree.

Defendant recognizes that the decision to allow expert testimony "is reviewed on appeal under the deferential abuse of discretion standard" (*People v. Mayfield*, *supra*, 14 Cal.4th 668, 766), that is, reversal occurs only if the ruling exceeded the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.) The same standard applies to rulings made under the discretionary authority of section 352. (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

Defendant's arguments appear to have an element of inconsistency. If trial counsel and appellate counsel are correct that CSAAS evidence would be irrelevant to dispelling "myths" that were no longer accepted, it is difficult to see how such evidence could retain any power to inflame the jury. But that irrelevance is merely assumed. Defendant makes no reference to evidence in the record establishing that the presumed myths no longer needed dispelling. The court told defense counsel "you can certainly

7

cross-examine him up one side and down the other on the myths and how they've changed over the past 30 years," yet counsel chose not to do so. Here, we believe it appropriate to defer to the trial court's knowledge of local conditions and the jury. (See fn. 3, ante.) Accordingly, we cannot conclude the court abused its discretion in allowing expert testimony by Dr. Carpenter. (*People v. Benavides*, *supra*, 35 Cal.4th 69, 88; *People v. Mayfield*, *supra*, 14 Cal.4th 668, 766.)

Next, by invoking section 352, defendant is necessarily obliged to concede that Dr. Carpenter's testimony was relevant. In claiming error under section 352, defendant's basic approach sees the fact of abuse as "implicit" in all CSAAS testimony, specifically, "that implicit in CSAAS's very description of 'delay' is the presumption the child was molested—otherwise there is no starting point from which to measure the delay. Thus, by arguing [the victim's] delay was behavior consistent with CSAAS and the jury should therefore believe her, the prosecutor asked the jury to presume she was molested." Even on its own terms, this argument still falls short of what section 352 is meant to exclude.

The logic of defendant's argument is that "when a defendant is charged with a sex offense against an alleged victim perpetrated in secret, and the only real contest for the jurors to decide is which of the two is telling the truth," "any expert who can present a seemingly reasonable explanation for his or her conclusions is likely to lend an 'aura of special reliability and truthfulness' to the contention of the party for whom he or she testifies." This logic proves too much, for it applies equally to prosecution and defense, and thus, according to defendant, any expert in a child abuse case tips the balance against the other side and thus qualifies as prejudicial—as that term is used in section 352—to the other side.

The "undue prejudice" mentioned in section 352 has a distinct meaning. It refers to evidence " 'that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues' " (*People v. Samuels* (2005) 36 Cal.4th 96, 124) or which is "likely . . . to be used in some manner unrelated to the issue on which it is admissible." (*People v. Edelbacher* (1989) 47 Cal.3d

8

983, 1016.)  It is not synonymous with evidence that is merely damaging to the defendant.  (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

Dr. Carpenter's testimony was not inflammatory on its face.  Yes, the actual occurrence of abuse was a predicate of how to evaluate the testimony of a child allegedly reporting abuse.  However, Dr. Carpenter expressly conceded as much on cross-examination.  And, the jury was expressly told by CALCRIM No. 1193 (quoted and discussed in the following section of this opinion) not to assume or to use Dr. Carpenter's testimony as proof of abuse, and there is nothing to rebut the presumption that the jurors followed that instruction.  (See *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9; *People v. Pearson* (2013) 56 Cal.4th 393, 414.)  It follows that there was no reason the prosecutor could not use Dr. Carpenter's testimony about CSAAS as a reason the jury should find the victim credible.

Three additional points raised by defendant require only brief mention.

First, he asserts that Dr. "Carpenter's testimony that more than 90% of child molestation was perpetrated by a family member [citation] unfairly bolstered [the victim's] testimony and the prosecutor's case."  There being no timely and specific objection by defendant at trial, this point was not preserved for review.  (Evid. Code, § 353, subd. (a); *People v. Kennedy* (2005) 36 Cal.4th 595, 612.)

Defendant's second point is framed as follows:  "perhaps most inflammatory was Carpenter's testimony admitted over defense objection that only 'the minority of [molested] children' ever reveal they have been molested.  (RT II, pp. 300, 306-307.)"[4] But no objection appears on the cited pages, so this point too is forfeited.

The same reasoning also applies to defendant's third and final point, namely, that Dr. Carpenter's testimony "strongly suggested to the jury that numerous cases of child molestation went unreported—that the number of victims dwarfed the number of

---

[4] We note that the defense cross-examination of Dr. Carpenter commenced on page 305 of the second volume of the reporter's transcript.

defendants—and was likely to inspire jurors to convict appellant to stem the tide of victimization."

## CALCRIM No. 1193

The trial court instructed the jury with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Carpenter regarding child sexual abuse accommodation syndrome. Dr. Carpenter's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

The caption of defendant's opening brief frames his next contention as follows: "Even if Carpenter's testimony was admissible for a limited purpose, that purpose was exceeded because the trial court instructed the jurors with CALCRIM 1193 that the testimony may be considered to decide [the victim] was molested, depriving appellant of due process under the Fourteenth Amendment." This is precisely how the instruction told the jury Dr. Carpenter's testimony could *not* be used. However, reading beyond the caption, it appears defendant has a different objective.

Citing *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*), defendant argues: "*Bowker* prescribed specific components for instruction when CSAAS evidence is admitted. . . . If an instruction *is* warranted it must only be a cautionary one that tells the jurors how it may *not* be used as prescribed in *Bowker*." *Bowker* was the first decision allowing CSAAS testimony, but with limitations. One of the safeguards to prevent misuse of such testimony was "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reaction as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker*, *supra*, 203 Cal.App.3d at p. 394.) Defendant construes *Bowker* as purely negative: the jury must be instructed only on what it cannot consider. But here CALCRIM No. 1193 allowed a positive use of CSAAS

10

testimony, namely, in evaluating the supposed victim's version. From this defendant concludes the instruction is "legally erroneous."

This is not how we have construed *Bowker*. "[I]n all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*People v. Housley* (1992) 6 Cal.App.4th 947, 959.)

### No "Cumulative Denial of Due Process"

On the assumption that his first and second contentions have succeeded, defendant contends they demand reversal because the judgment reflects "a cumulative denial of due process." Because the predicate for this contention fails, so too does the argument built upon that predicate.

### Substantial Evidence

The jury's task (and ours) was assisted by the verdict forms, which identified the precise act alleged to constitute a specific count of the information. Defendant contends that substantial evidence does not support count four, a violation of section 288.7, subdivision (b), that defendant was supposed to have committed when he "touched [the victim's] anus with his tongue."

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the

trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

Defendant does a thorough job of summarizing both the victim's testimony, and what the victim told the interviewer at the Children's Interview Center, to back up the conclusion that collectively it fails to prove that defendant's tongue actually came into contact with the victim's anus. However, in focusing on the evidence favorable to the desired conclusion, defendant fails to appreciate the principle that the jury was free to reject those portions of evidence while accepting other parts from which the prohibited contact could be deduced. (E.g., *People v. Thornton* (1974) 11 Cal.3d 738, 755; *People v. Lacefield* (2007) 157 Cal.App.4th 249, 261.) Specifically, the portion of her initial interview that defendant put his tongue in that part of her "bottom" where "I go poo-poo." That alone is enough. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

### The Dismissed Juror

The minutes show that the jury left the courtroom to begin deliberations at 2:36 on the afternoon of September 10, 2014. The jury deliberated for less than 90 minutes before halting for the day. The following morning, after deliberations resumed, the court received a written "jury request" advising that "Juror #11 would like to know if he may discuss with the fellow jurors what he discussed with the judge?" And then the following occurred:

"THE COURT: . . . We're on the record with just (Juror No. 100), who is the foreperson of the jury. Both counsel are present, and Mr. Griffith's presence has been waived.

"So I received a note with a question. And what I'm wondering is, How did that subject come up?

"JUROR NO. 100: This particular gentleman is having a hard time with saying what he would like to say about it, and he's saying he wants to get your permission because the arguments—

12

"THE COURT: Okay.

"JUROR NO. 100: He's saying he can't argue fairly without this information—he can't argue the way he'd like to for us to understand his point of view.

"THE COURT: All right. [¶] Has there been any discussion by him of penalty or punishment?

"JUROR NO. 100: Um, there—he has expressed his views on what he believes the defendant should face. [¶] Is that what you're asking me?

"THE COURT: Well, in a manner of speaking, the jury is instructed not to consider penalty or punishment—

"JUROR NO. 100: Yeah.

"THE COURT: —in any way.

"JUROR NO. 100: Yeah.

"THE COURT: And has he expressed—

"[JUROR NO. 100]: No, it's just an idea of his reasoning behind what he would like to say would back up what he believes to be true, you know, from the witnesses and the testimony. He's very big on the testimony that happened that took place that is going to prove his point to the rest of us.

"THE COURT: Counsel, do you have questions you want me to ask (Juror No. 100)?

"MR. WALPOLE [deputy district attorney]: No. I mean, it's difficult.

"THE COURT: Yes, it is.

"MR. WALPOLE: I can't think of anything that wouldn't be an inappropriate question to ask.

"MR. DONOVAN [defense counsel]: I'm in the same boat, Judge.

"THE COURT: Okay. So here's what I'm going to tell you [Juror No. 100]. I've written a note saying, Nothing may be discussed in the jury room but the evidence introduced at trial. That's it. Nothing else is of any consequence. Nothing else is of any moment.

"JUROR NO. 100: Okay.

13

"THE COURT: It has to be simply the evidence introduced at trial. So anybody's background, their experience, none of that—

"JUROR NO. 100: Yes.

"THE COURT: —is relevant.

"JUROR NO. 100: And I believe. In my perspective, that Juror No. 11 doesn't understand that fully.

"THE COURT: I understand.

"JUROR NO. 100: So it's hard to speak.

"THE COURT: Let me ask you this: Is he in any way refusing to deliberate with other jurors?

"JUROR NO. 100: He's deliberating. He's just set in what he believes and what he believes to be true because of one testimony that he doesn't—

"THE COURT: Okay.

"JUROR NO. 100: —agree with.

"THE COURT: Okay. All right. [¶] Well, I'm going to send this note back—

"JUROR NO. 100: Okay.

"THE COURT: —with our bailiff. So you'll have it. And we'll see what we're going to do next.

"JUROR NO. 100: Yeah.

"THE COURT: We'll either send you all back in or we'll have another discussion.

"JUROR NO. 100: Okay. Thank you.

"THE COURT: Thank you very much.

"(Whereupon, Juror No. 100 exits the courtroom.)

"THE COURT: All right. Well, my inclination is to bring him in. I don't know what his issue is, but his background working at San Quentin is simply not relevant to this proceeding. And if he's trying to introduce it into this jury, that's a problem.

"MR. WALPOLE: Okay. I think the Court's right.

"THE COURT: Let's have him in, Pete."

14

When Juror No. 11 came into the courtroom, the court addressed him as follows:

"THE COURT: . . . We have received a note that (Juror No. 100) sent in. And of course I sent—I'm sending back the note saying, 'Nothing may be discussed in the jury room but the evidence at trial.'

"JUROR NO. 11: Excuse me?

"THE COURT: 'Nothing may be discussed in the jury room but the evidence at trial.' That is it.

"So I'm not certain what information you wanted to impart to them, but if it has anything to do with your background at San Quentin or anything like that, that's not relevant. The jury may not discuss penalty or punishment. That's an absolute must, period. And if you are using penalty or punishment, [Juror No. 11], that's a very big issue for the Court.

"JUROR NO. 11: No, I'm not using anything. I have not implied anything.

"THE COURT: Okay.

"JUROR NO. 11: As far as they know, what we discussed in open court is what they know about me.

"THE COURT: Okay. So . . .

"JUROR NO. 11: Now, there's a dilemma. Without me telling you what's happening in there, there's a dilemma that—in my mind that kept me up last night, and the trial has weighed on me throughout the last two weeks, I'm sure, as everybody in the courtroom.

"And—and last night after the deliberations yesterday, it weighed on me very much. I don't know how much I can tell you. If I say too much, just tell me when to stop.

"THE COURT: Well, I don't want to know too much information.

"JUROR NO. 11: Well, without any clarity, we did exactly what you said. We asked for a foreperson. They have one.

"THE COURT: Right.

15

"JUROR NO. 11:  Everyone agreed on that person.  And then that person said, well, if I—'Can we take a opinion on what's going on in people's heads right now?'

"THE COURT:  Okay.  So don't tell me.

"JUROR NO. 11:  I won't tell you what's going on.  It went around the table.  And then once it went around the table, then I felt compelled—well, I'm—not at that point.  Later though—from that point on till we left, it was one way.  And then this morning it started right back with the same thing.

"I'm thinking, well, to myself, if I let them understand why I'm coming this way, then maybe they'll understand and move on.

"THE COURT:  Okay.  So—but I'm not understanding, what you disclosed to the court, what relevance that has.

"JUROR NO. 11:  It's—to me it has relevance in the way that I'm voting.  I'm—I understand the—our life—our life history is weighed into this as well.

"I mean, for example, if—I'm going to give a crude example.  Every day has—we know has—every month has 25 days.  And so if I'm being told that, well, there's some months that don't, and everyone else is believing, I have to explain, Wait a minute.  That's not true.  We have—and because my—my—my life as I've existed up to this point knows that that's a fact.

"Now, the people that are not understanding what I'm trying to convey to them, they're not accepting what I'm saying.  And the only way I think I can make them understand what I'm saying is my life history dictates that I understand why I'm at this point.

"THE COURT:  Okay.  But the problem is if you're relying on your life history rather than the testimony, that's a problem.

"JUROR NO. 11:  I'm not.

"THE COURT:  Okay.  So you're strictly dealing with the testimony.

"JUROR NO. 11:  Yes.

"THE COURT:  Okay.  And you're not using your experience as a guard in any way, shape, or form to make this opinion?

16

"JUROR NO. 11: No, not—the opinion I have, to make me hold that opinion, I'm using that.

"THE COURT: All right. You're not allowed to use that.

"Your opinion cannot be based on extraneous things. And your being a guard is extraneous. So if you're using that, (Juror No. 11), that's improper. And if you can't separate it out, if you're not able to separate it out, I need to know that. It's really important, because you're not allowed to use that experience as a guard to move forward with deliberations.

"I know it's difficult. Believe me. I understand that. But if you're relying on that, that would be an improper basis.

"JUROR NO. 11: Your Honor, I want to give Mr. Donovan and Mr. Walpole both 100 percent my attention, which I believe I have. And I want to give them both the decision that they both deserve if I think that it's fair. And for me to move on with— you're telling me that I can't use this experience that I have, my—if—when she said, Let's take this vote, that vote came from what happened in this courtroom.

"THE COURT: Correct.

"JUROR NO. 11: Okay?

"THE COURT: Okay.

"JUROR NO. 11: That had nothing to do with whether I work at Home Depot or 20 years ago I worked at San Quentin.

"THE COURT: Right.

"JUROR NO. 11: That had nothing to do with my vote.

"THE COURT: Okay.

"[JUROR NO. 11]: Okay. Now, to continue forward from that point, because we have every one of these different things—

"THE COURT: Right.

"JUROR NO. 11: —and then they refer to the lessers.

"THE COURT: Exactly.

"JUROR NO. 11: Okay.

17

"THE COURT: All right.

"JUROR NO. 11: To continue forward on those, I have to reach back here and say, Well, wait a minute. Can I go forward with this or without this, without this experience?

"THE COURT: You cannot use that experience.

"JUROR NO. 11: Then I think I request that—I don't know. Can I be removed?

"THE COURT: Yes, you can be.

"JUROR NO. 11: Okay. Because I—at this point I—and if you want to talk to me after chambers, then I will explain why 'cause I—

"THE COURT: No, I understand what you—I understand that you're—what you're telling me, which is that you cannot move forward without relying on, as you pointed to the back of your head, what's back there. That's what you're saying?

"JUROR NO. 11: Correct.

"THE COURT: Okay. And what I'm saying is that has to be set aside, because it's not part of the testimony at trial. It's not part of the evidence. It's just part of your thought—your opinion based on your experience. But your experience was not introduced in the trial. And it's not part of the evidence.

"JUROR NO. 11: I understand that.

"THE COURT: So that can't be used.

"JUROR NO. 11: Okay.

"THE COURT: If you can't separate it out, then I am going to have to remove you.

"JUROR NO. 11: Yeah, Your Honor, believe me. I—

"THE COURT: No, I understand.

"JUROR NO. 11: —clearly respect you and this Court and every procedure about this more so than I think most of these other people, because I was involved in it.

"THE COURT: Yes.

"JUROR NO. 11: And I'm at a dilemma now that I've never been in. When I went to civil court, it was no big deal.

18

"THE COURT: That's right.

"JUROR NO. 11: Criminal court and what goes on in San Quentin is in my mind.

"THE COURT: All right.

"JUROR NO. 11: And I can't—I can't separate the two.

"THE COURT: Okay. No, I understand that. . . . (Juror No. 11)—I appreciate your honesty, though, because we need to know this. It's very important. And so I appreciate the fact that you did not disclose the information in the jury—

"JUROR NO. 11: (Nods head.)

"THE COURT:—that you appreciated the fact that you needed to ask the Court first. And I'm glad, because otherwise we would have had a panel that's tainted, completely tainted. And that would have been a big problem.

"JUROR NO. 11: And I can—I can tell you even where the point—well, no, I won't say that, because that might divulge something else.

"THE COURT: Yes, I don't want to know anything about what goes on.

"JUROR NO. 11: Okay.

"THE COURT: I just want to deal with you. [¶] So I—

"JUROR NO. 11: Gentlemen, I apologize if I did anything. [¶] And to you Judge, I apologize.

"THE COURT: You did the right thing, (Juror No. 11). You absolutely did. By coming forward the way you did, you corrected a situation before it got worse. So that was the right thing. And I do appreciate it, and I appreciate your service.

"JUROR NO. 11: Okay.

"THE COURT: Thank you. And I'll excuse you."

Section 1089 provides for the discharge of a juror "before or after the final submission of the case to the jury" for "good cause" shown. In reviewing a trial court's decision to discharge a juror, we reverse only when we conclude the trial court exceeded the bounds of reason, and thus abused its discretion. Abuse will not be found if the trial court's determination of "good cause" has the support of substantial evidence. (E.g., *People v. Earp* (1999) 20 Cal.4th 826, 892; *People v. Lucas* (1995) 12 Cal.4th 415, 489.)

19

Defendant contends discretion was abused, because the court's action removed a juror "who was willing and able to deliberate and was constitutionally entitled to view the evidence through the lens of his personal background and experience." The Attorney General argues trial counsel's silence forfeits this fact-specific point for review. We agree. (E.g., *People v. Holt* (1997) 15 Cal.4th 619, 656–657; *People v. Lucas, supra*, 12 Cal.4th 415, 488–489.) In any event, had the point been preserved for review, no basis for reversal appears according to any standard for prejudice.

It is more than clear from his responses that Juror No. 11 was in effect insisting on *telling* the other jurors how he viewed the evidence through his "lens" as a former prison guard. Not just evaluating the evidence, but *communicating* that evaluation to the other jurors. When Juror No. 11 admitted that he could not do so, the court was confronted with a situation where a juror was admitting he could not separate his opinion from the evidence, and could not refrain from expressing that opinion to other jurors. In such circumstances, we cannot conceive that any trial judge would have acted differently.

### The Sentence

The trial court sentenced defendant to a determinate term of 40 years (eight consecutive years for each of the five convictions for violation section 288, subdivision (b)(1)) and an indeterminate sentence of 60 years to life (15 years for each of five convictions for violation of section 288.7, subdivision (b), only one of which was made concurrent). Citing Justice Mosk's dissent in *People v. Jones* (1990) 51 Cal.3d 294, his concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, and "recent opinions" disallowing life terms for juveniles, defendant contends his aggregate sentence violates the federal constitutional prohibition on cruel and unusual punishment because it "requires him to serve a term longer than a human life . . . an absurdity that serves no legitimate penal purpose." "[A] sentence that no human could conceivably complete serves no rational legislative purpose, under either a retributive or a utilitarian theory of punishment."

Only obliquely does defendant concede the mass of authority against him. To cite only the published decisions from this appellate district: *People v. Sullivan* (2007)

20

151 Cal.App.4th 524; *People v. Wallace* (1993) 14 Cal.App.4th 651; *People v. Huber* (1986) 181 Cal.App.3d 601. Put bluntly, no court has agreed with defendant. This is an elemental principle, one now fixed for more than three decades. Now is not the time for one intermediate court of review to challenge the settled unanimity.

## The Minor Sentencing Errors

At sentencing, the trial court ordered defendant to pay fines of $520 pursuant to section 1465.8 and $390 pursuant to Government Code section 70373. The parties agree that the correct figures on the abstract of judgment for the indeterminate sentence should be $440 and $330, respectively. They also agree that the abstract of judgment for the determinate sentence should be modified to delete a reference that defendant was convicted on count 10 and sentenced to a term of eight years.

## The Restitution Order

The prosecution requested that defendant be ordered to pay $500,000 as noneconomic restitution to the victim. Defense counsel argued the figure should be no more than $50,000. The trial court believed that $300,000 was "appropriate."

Defendant does not dispute that restitution is statutorily authorized for "Noneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." (§ 1202.4, subd. (f)(3)(F).) However, he argues that by reason of "the unique risk of erroneous factfinding present in restitution determinations for noneconomic losses, the Fourteenth Amendment guarantees [him] a jury trial." This court has concluded there is no such right. (*People v. Chappellone* (2010) 183 Cal.App.4th 1159, 1183–1184.)

Defendant acknowledges that " ' "[t]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole . . . ." ' " (*People v. Sy* (2014) 223 Cal.App.4th 44, 63), but he claims the "the record contains no evidence of [the victim's] psychological harm."

If anything, the standard of review may be even more deferential. "The obvious difference between the review of a civil award of noneconomic damages and a criminal

21

restitution order for noneconomic damages is that the trial court, not a jury, makes the determination in the first instance. Even with that difference in mind, we see no reason to adopt any other standard of review. We therefore affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court. [¶] Admittedly, this standard is not as delimited as the review of a restitution order for economic damages. By their nature, economic damages are quantifiable and thus awards of economic damages are readily reviewed for whether they are 'rationally designed to determine the . . . victim's economic loss.' [Citation.] Noneconomic damages, however, require more subjective considerations. Thus, the different standard is justified." (*People v. Smith* (2011) 198 Cal.App.4th 415, 436.) Moreover, we recently noted that " ' " 'Section 1202.4 does not, by its terms, require any particular kind of proof. However, the trial court is entitled to consider the probation report, and, as prima facie evidence of loss . . . .' [Citations.] ' "This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution. [Citation.] When the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount." ' [Citations.]" ' " (*People v. Weatherton* (2015) 238 Cal.App.4th 676, 684.) Unlike economic damages, which are concerned with "objectively verifiable monetary losses" (Civ. Code, § 1431.2, subd. (b)(1)), noneconomic damages relate to "subjective, nonmonetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2); see *People v. Smith*, *supra*, 198 Cal.App.4th at p. 431.)

Here, the probation officer believed that the victim's noneconomic damages were "substantial." The trial court termed defendant's conduct "egregious," noting "this child is going to have a very difficult time dealing with what's happened to her. [T]here really is no way to compensate her for what's been taken away" and "what she now has to live

with." The $300,000 awarded was "for psychological harm to the victim." Moreover, previously, at the time of sentencing, the court—which had observed the victim at the trial—had told defendant: "This child is clearly traumatized. [I]t's created an extreme havoc in her life and in her family's life." We conclude the restitution award is supported by substantial evidence, it was not an abuse of the trial court's discretion, and it does not shock our conscience.

## DISPOSITION

The judgment of conviction is modified to delete any reference to defendant being convicted of violating Penal Code section 288, subdivision (b)(1) as count ten, and to show that the fine imposed pursuant to Penal Code section 1465.8 is $440, and the fine imposed pursuant to Government Code section 70373 is $330. As so modified, the judgment is affirmed in all other respects. The clerk of the superior court is directed to prepare new abstracts of judgment and to forward certified copies to the Department of Corrections and Rehabilitation. The restitution order is affirmed.

_____
Richman, Acting P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

A143583 & A144727; *P. v. Griffith*

24